WILFREDO M. RAMOS *v.* COMMISSIONER OF
CORRECTION
(AC 20315)

Landau, Flynn and O'Connell, Js.

Argued September 20, 2001—officially released January 22, 2002

*David B. Rozwaski*, special public defender, for the appellant (petitioner).

*Joy K. Fausey*, deputy assistant state's attorney, with whom, on the brief, were *John A. Connelly*, state's attorney, and *Robin Lipsky*, assistant state's attorney, for the appellee (respondent).

*Opinion*

FLYNN, J. This appeal arises from the habeas court's denial of a petition for a writ of habeas corpus. The

petitioner, Wilfredo M. Ramos, claims that the habeas court improperly found (1) that he pleaded guilty voluntarily and (2) that he had effective assistance of counsel during the sentencing phase of his case. The petitioner contends that "gross misadvice" from his counsel coupled with the retroactive application of Megan's Law[1] renders his guilty plea involuntary. He also alleges that his counsel was ineffective in failing to offer more mitigating evidence at the sentencing hearing and in failing to apply for sentence review. We affirm the judgment of the habeas court.

The incident that gave rise to criminal charges against the petitioner took place on June 27, 1989. On that day, a thirteen year old girl reported being thrown to the ground, choked and sexually assaulted in Waterbury's Washington Park. She identified the petitioner, whom she had known prior to the incident, as her assailant. Medical examination of the girl confirmed many details of her version of the incident. The injuries that she had sustained were consistent with a recent sexual assault in the manner she had described. She was prepared to testify against the petitioner at trial had he not pleaded guilty.

On August 7, 1989, the petitioner pleaded guilty under the *Alford* doctrine[2] to the charge of sexual assault in

[1] "Megan's Law" is the collective term for statutes enacted in the wake of the rape and murder of a seven year old girl, Megan Kanka, in New Jersey in 1994. *State* v. *Misiorski*, 250 Conn. 280, 290–91, 738 A.2d 595 (1999). The man convicted of raping and murdering Megan was a previous repeat sex offender against minor children who lived across the street from the Kanka family. The Kanka family was unaware of his history of sexual assault against young girls. Id. Megan's Law, as enacted in Connecticut, requires, inter alia, that convicted sex offenders register with the commissioner of public safety as a sex offender if they are released into the community. See General Statutes § 54-251 et seq. The department of public safety and all local police departments maintain a registry of all such sex offenders and are directed by the statute to inform individuals of dangers posed by a local sex offender. General Statutes §§ 54-257 and 54-258.

[2] See *North Carolina* v. *Alford*, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970). "A defendant who pleads guilty under the *Alford* doctrine does

the first degree in violation of General Statutes (Rev. to 1989) § 53a-70.[3] The guilty plea followed an agreement between the state and the petitioner, under which the state was to nolle a felony charge of risk of injury to a child in violation of General Statutes § 53-21 and the petitioner was to serve fifteen years, execution suspended after ten years followed by five years of probation. The petitioner reserved "the right to argue for less" under this agreement. Before accepting the guilty plea, the trial court canvassed the petitioner in accordance with the procedures outlined in Practice Book §§ 711, 712 and 713, now §§ 39-19, 39-20 and 39-21, and ensured that the petitioner understood the range of sentences that could be imposed, the nature of the charge and that he was waiving certain constitutional rights by pleading guilty. The petitioner acknowledged all of these consequences on the record. On the sentencing date, however, the petitioner attempted to withdraw his guilty plea. Taken by surprise, the trial court granted a continuance to review the plea transcripts. After reviewing them, the trial court denied the petitioner's motion to withdraw the guilty plea. In his direct appeal, the petitioner claimed that this judgment was improper. *State* v. *Ramos*, 23 Conn. App. 1, 579 A.2d 560 (1990). This court upheld the trial court's denial of the petitioner's motion to withdraw his plea, concluding that the entire record demonstrated that the petitioner voluntarily and knowingly entered his guilty plea. Id., 4.

Several years later, on April 26, 1999, the petitioner filed a petition for a writ of habeas corpus. In this

not admit guilt but acknowledges that the state's evidence against him is so strong that he is prepared to accept the entry of a guilty plea." (Internal quotation marks omitted.) *State* v. *Webb*, 62 Conn. App. 805, 807 n.1, 772 A.2d 690 (2001).

[3] General Statutes (Rev. to 1989) § 53a-70 provides in relevant part: "A person is guilty of sexual assault in the first degree when such person compels another person to engage in sexual intercourse by the use of force against such other . . . or by threat of use of force . . . which reasonably causes such person to fear physical injury . . . ."

petition, the petitioner again claimed, inter alia, that his guilty plea was involuntary, but under two new theories not raised in his 1990 appeal. First, the petitioner claimed that his counsel grossly misadvised him prior to his plea. Second, he claimed that the unforeseen application of Megan's Law, requiring him to register as a sex offender[4] and to give a blood sample,[5] rendered his plea involuntary. The petitioner also claimed that he did not have effective assistance of counsel during sentencing and at all times when the petitioner could have applied for sentence review. The habeas court denied the petition and granted certification to appeal.

## I

## VOLUNTARINESS OF THE PLEA

### A

The petitioner first claims that his guilty plea was involuntary due to "gross misadvice" from his trial counsel.[6] The petitioner alleges that his counsel "led [him] to believe . . . that his charges would be reduced and that he would receive [less] time" if he pleaded guilty. Because the petitioner offers no basis to challenge the habeas court's factual finding that the petitioner had not proven that the communications alleged to be misadvice occurred, this claim fails.

---

[4] Chapter 969 of the General Statutes requires the registration of convicted sexual offenders such as the petitioner. See part I B.

[5] General Statutes § 54-102g et seq. provide for the extraction and DNA testing of a blood sample from a person convicted of a sexual offense. The DNA testing conducted under this statute is for "identification characteristics"; General Statutes § 52-102g (a); in order to aid future investigations and protect the public from the scourge of sexual crimes.

[6] The petitioner couched this claim under two separate legal theories— ineffective assistance of counsel and involuntary plea doctrine. Because both of these theories depend on subordinate facts found by the habeas court to be unproven, we do not address the specific standards applicable to these theories in this section of the opinion.

Our standard of review in assessing this question of habeas court fact-finding is well settled. "The underlying historical facts found by the habeas court may not be disturbed unless the findings were clearly erroneous." *Copas* v. *Commissioner of Correction*, 234 Conn. 139, 152, 662 A.2d 718 (1995).

The petitioner correctly notes that "gross misadvice" by counsel has supported the invalidation of a guilty plea in the past. See generally *Falby* v. *Commissioner of Correction*, 32 Conn. App. 438, 446–47, 629 A.2d 1154, cert. denied, 227 Conn. 927, 632 A.2d 703 (1993). The petitioner offers no basis, however, to disturb the habeas court's factual finding that the petitioner had not established the occurrence of the communications that he alleged to be gross misadvice. The habeas court found that the petitioner "lacked credibility" in his assertion that counsel had promised him leniency in sentencing. The trial court canvassed the petitioner in detail, and the petitioner admitted that he understood the terms of his plea. Despite an outspoken, "aggressive trait" noted by the habeas court, the petitioner did not voice any reservations about those terms, even as he was sentenced. It is not our role to reevaluate the credibility of witnesses or to overturn factual findings of a habeas court unless they are clearly erroneous. *Cosby* v. *Commissioner of Correction*, 57 Conn. App. 258, 259, 748 A.2d 352 (2000). The petitioner has not provided a legal argument to support the claim that these findings were "clearly erroneous." Accordingly, this claim fails.

B

The petitioner also claims that he pleaded guilty involuntarily because he was unaware that he would have to comply with Megan's Law upon his release from prison. We disagree.

Under Megan's Law, sexual offenders are now required to register certain information with the com-

missioner of public safety upon their release into the community. The information required includes the offender's "name, identifying factors, criminal history record and residential address . . . ." General Statutes § 54-251 (a). The commissioner of public safety and all local police departments then maintain a public registry of this information and may actively notify people, if believed necessary, "to protect the public or any individual . . . ." General Statutes § 54-258 (a) (2). A sex offender who fails to register according to Megan's Law commits a class D felony. See General Statutes §§ 54-251 (d), 54-252 (d), 54-253 (c) and 54-254 (b). General Statutes § 54-102g et seq. authorize the extraction and DNA testing of a blood sample from a person convicted of a sexual offense. The DNA testing conducted under these statutes is for "identification characteristics." General Statutes § 54-102g (a). As with the practice of fingerprinting, this is designed to aid future investigations and to protect the public. General Statutes § 54-102j. In the recent case of *Doe* v. *Dept. of Public Safety*, 271 F.3d 38, 61–62 (2d Cir. 2001), the United States Court of Appeals for the Second Circuit affirmed the decision by the United States District Court for the District of Connecticut enjoining public dissemination of the registry unless an appropriate opportunity to be heard is afforded on the issue of whether a registrant presently is dangerous to the community. Megan's Law applies to the petitioner retroactively. See *State* v. *Kelly*, 256 Conn. 23, 90–94, 770 A.2d 908 (2001). At the time of the petitioner's plea, Megan's Law had not yet been enacted in Connecticut. The petitioner claims that his guilty plea was involuntary and unintelligent because he could not have anticipated Megan's Law and its consequences.

A criminal defendant waives several constitutional rights by pleading guilty, including the right to a jury trial, the right against self-incrimination and the right

to confront one's accusers. *Boykin* v. *Alabama*, 395 U.S. 238, 243, 89 S. Ct. 1709, 23 L. Ed. 2d 274 (1969). The waiver of these rights must be knowing, intelligent and voluntary as a matter of constitutional law. Id., 243 n.5; e.g. *Miranda* v. *Arizona*, 384 U.S. 436, 444, 475, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966) (waiver of right against self-incrimination). The United States Supreme Court generally enforces this standard for the relinquishment of fundamental constitutional rights. A guilty plea is a conviction. *Boykin* v. *Alabama*, supra, 242. Thus, a defendant must understand the elements of the crime charged in order to plead guilty. *McCarthy* v. *United States*, 394 U.S. 459, 466, 89 S. Ct. 1166, 22 L. Ed. 2d 418 (1969); *State* v. *Wideman*, 38 Conn. App. 581, 585, 663 A.2d 409, cert. denied, 235 Conn. 907, 665 A.2d 906 (1995). Recognizing this, the United States Supreme Court standardized a prophylactic safeguard known as the canvass—a colloquy between the trial judge and the defendant that creates a record of the defendant's "full understanding of what the plea connotes and its consequence." *Boykin* v. *Alabama*, supra, 244.

In Connecticut, as in all other jurisdictions within the United States, we have developed more specific requirements for a plea canvass. Under Practice Book § 39-19, the trial court must "[address] the defendant personally and [determine] that he fully understands" the possible sentences, the nature of the charge and that the defendant has the constitutional rights he is relinquishing by entering a guilty plea. Under Practice Book § 39-20, the trial court must ensure that the defendant is not pleading guilty due to threats or promises outside the terms of a plea agreement. Our Supreme Court has, thus far, declined to extend the requirements of a plea canvass beyond those set forth in Practice Book §§ 39-19 through 39-21. See, e.g., *State* v. *Andrews*, 253 Conn. 497, 507, 752 A.2d 49 (2000). Even in enforcing

Practice Book §§ 39-19 and 39-20, our Supreme Court has not demanded perfect compliance. See, e.g., *State* v. *Domian*, 235 Conn. 679, 687–89, 668 A.2d 1333 (1996) (failure to canvass defendant as to "minimum sentence" does not necessarily void guilty plea as involuntary).

The petitioner urges us to consider the gravity of the consequences he suffers under Megan's Law, inviting a comparison between a criminal sentence and sex offender registration. It is true that Practice Book § 39-19 (2) through (4) require a trial court to apprise a defendant of the range of possible "sentence[s]" which he may suffer in pleading guilty. However, the consequences of Megan's Law in this case do not fall within this rule. Section 39-19 refers only to the relevant maximum and minimum length of a sentence. The petitioner's argument proceeds, therefore, by analogy. He argues that both the length of a criminal sentence and the requirements of Megan's Law are serious consequences of a guilty plea, which might give a defendant pause in opting to plead guilty. The petitioner stresses that had he known Megan's Law would apply to him at the time, he would not have pleaded guilty.

We first observe that this argument assumes that the sentencing advisory mandated by § 39-19 is constitutionally required as a matter of due process. On this particular question, *Boykin* is ambiguous. The *Boykin* court only proclaimed that a defendant should understand the "consequence" of a guilty plea. *Boykin* v. *Alabama*, supra, 395 U.S. 244. An infinity of consequences flow from a guilty plea. A trial judge, or any human being for that matter, is in "no position to advise on all the ramifications of a guilty plea personal to a defendant." *People* v. *Ford*, 86 N.Y.2d 397, 403, 657 N.E.2d 265, 633 N.Y.S.2d 270 (1995).

The consequences specifically referenced in *Boykin* were simply that the defendant is waiving three major

constitutional rights. Nonetheless, courts have further expanded the meaning of "consequence." Whether under the auspices of due process; see, e.g., *United States* v. *Salerno*, 66 F.3d 544, 550–51 (2d Cir. 1995), cert. denied sub nom. *DiGirolamo* v. *United States*, 516 U.S. 1063, 116 S. Ct. 746, 133 L. Ed. 2d 694 (1996); or under independent rules of practice; see *State* v. *Andrews*, supra, 253 Conn. 507; courts have divided the results of a guilty plea into (1) "direct" and (2) "collateral consequences." A court is obligated to apprise a defendant of direct consequences but not collateral consequences. Id., 504–505. Direct consequences have been defined as those consequences having a "definite, immediate and largely automatic affect on [a] defendant's punishment." (Internal quotation marks omitted.) *State* v. *Nguyen*, 81 Haw. 279, 288, 916 P.2d 689 (1996). Again, the requirements imposed on the defendant by Megan's Law have been held not to be punishment. *State* v. *Kelly*, supra, 256 Conn. 94. In *Kelly*, where the defendant was found guilty after trial, our Supreme Court held that the effects of Megan's Law as applied to a defendant were nonpunitive and therefore did not violate the ex post facto clause of the United States constitution. U.S. Const., art. I, § 10; *State* v. *Kelly*, supra, 94.

Here, we address the nonpunitive effects of Megan's Law after a guilty plea and turn to whether they were definite, immediate and largely automatic and, thus, were required to be included in an advisory canvass before the plea was accepted. If, as many courts have held, due process requires a canvass on all definite punishment, a bright line rule excepting all definite *nonpunitive* effects of the plea might run afoul of due process concerns about the voluntariness of relinquishing constitutional rights. Whether or not these effects are termed "punitive," lack of knowledge of grave, definite consequences could determine that a

plea is not knowingly and voluntarily rendered. Thus, we examine not only whether the effects of a plea are punitive, but also whether the effects are definite, immediate and largely automatic, even where we have already determined that they are nonpunitive.

When the petitioner entered his guilty plea, however, the effects of Megan's Law were far from "definite, immediate and automatic." Megan's Law had not even been drafted. As with all other "collateral consequences" of a guilty plea, a trial judge should not be held to the impossible standard of predicting all future actions of the legislature that might impact a defendant who is pleading guilty. Although the effects of Megan's Law are *now* definite for defendants pleading guilty, they were not at the time of the petitioner's plea because Megan's Law did not exist. All effects of a guilty plea become definite at some point in the future, at the very latest, when they *occur*. *Boykin* required the plea canvass to cover certain consequences as a matter of due process because trial courts are "capable [of] canvassing" on such matters. *Boykin* v. *Alabama*, supra, 395 U.S. 244. At the time of the petitioner's guilty plea, the trial court was not capable of anticipating and canvassing on the effects of Megan's Law on the petitioner. Thus, the effects of Megan's Law stood among the forest of innumerable possible collateral effects of pleading guilty to this crime. Accordingly, we deny relief on this claim.

## II

## EFFECTIVE ASSISTANCE OF COUNSEL

### A

The petitioner next claims that his counsel during sentencing was ineffective. In support of this argument, the petitioner notes that certain evidence, most of which the petitioner concedes may not exist, was not

proffered at the sentencing hearing. Because the petitioner has failed to demonstrate that any such evidence would have had a "mitigating" effect on the sentence finally imposed, this claim fails.

The standard of review for a habeas court's denial of a claim of ineffective assistance of counsel is well settled. "In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous, but our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of counsel is plenary." (Internal quotation marks omitted.) *Goodrum* v. *Commissioner of Correction,* 63 Conn. App. 297, 299, 776 A.2d 461, cert. denied, 258 Conn. 902, 782 A.2d 136 (2001). To prevail on a claim of ineffective assistance of counsel, a habeas petitioner generally must set forth evidence establishing two elements. "First, the defendant must show that counsel's performance was deficient. . . . Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland* v. *Washington,* 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). "The performance yardstick is whether counsel's performance was 'reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law.' " *Tatum* v. *Commissioner of Correction,* 66 Conn. App. 61, 64–65, 783 A.2d 1151, cert. denied, 258 Conn. 937, 785 A.2d 232 (2001), quoting *Johnson* v. *Commissioner of Correction,* 36 Conn. App. 695, 703, 652 A.2d 1050, cert. denied, 233 Conn. 912, 659 A.2d 183 (1995). To establish prejudice, a defendant must demonstrate that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland* v. *Washington,* supra, 694.

In the present case, the petitioner simply notes that his brother did not have an opportunity to testify on

his behalf at the sentencing hearing. We cannot presume, on the state of this evidence, that there is a reasonable probability that this testimony would have altered the terms of the sentence. At the sentencing hearing, the petitioner's attorney argued for a lower sentence and the petitioner spoke on his own behalf. The evidence against the petitioner was strong. The court was aware of the petitioner's criminal record. Under his plea agreement, a felony charge of risk of injury to a child in violation of § 53-21 was nolled. The probability that the court would have reduced the petitioner's sentence, beneath the terms of his agreement, is remote. Thus, the petitioner has not established the necessary prejudice to warrant resentencing. Accordingly, this claim fails.

B

Finally, the petitioner claims that his counsel was ineffective in failing to apply for sentence review under General Statutes § 51-195. The petitioner asks us to reinstate his rights to sentence review because the statutory time limit for application has lapsed. We conclude that the habeas court properly determined this claim to be without merit.

The habeas court found that sentence review was not requested because case law had not made it available at that time. Under § 51-195, the legislature declared that sentences resulting from plea agreements were not subject to sentence review. Two years after the petitioner's plea, in *State* v. *Anderson*, 220 Conn. 400, 402, 599 A.2d 738 (1991), our Supreme Court held that when a defendant reserves the "right to argue for less," as in the petitioner's plea agreement, § 51-195 does not preclude sentence review. The petitioner was sentenced on October 6, 1989, roughly two years before *Anderson* was decided. Under no theory, then, could the petitioner's counsel have been deficient in failing to apply for sen-

tence review during these first two years. The petitioner responds by stating in his principal brief that defense counsel's duty of effective assistance includes the "timely filing of a sentence review application." The case that the petitioner cites, however, *Consiglio* v. *Warden*, 153 Conn. 673, 220 A.2d 269 (1966), does not stand for this vague proposition. In *Consiglio*, our Supreme Court held that the right to effective representation attached to a sentencing hearing. Id., 677. Other cases have recognized that it is incumbent upon defense counsel to advise their clients as to the rights to appeal and obtain sentence review. See, e.g., *State* v. *Silva*, 65 Conn. App. 234, 263–64, 783 A.2d 7, cert. denied, 258 Conn. 929, 783 A.2d 1031 (2001). However, it does not follow that there is a specific duty of defense counsel to monitor changes in the law of sentence review, years after conviction, and continually to apprise former clients of these changes. The petitioner introduced no expert testimony before the habeas court to establish that his trial counsel's conduct fell beneath the standard of "reasonabl[e] competen[ce] or [that it was not] within the range of competence displayed by lawyers with ordinary training and skill in the criminal law." (Internal quotation marks omitted.) *State* v. *Tatum*, supra, 66 Conn. App. 64–65. We conclude that it was not beneath the competency of an ordinary attorney in the field to fail to monitor and advise, ad infinitum, all changes in sentence review law relative to all former clients.

The petitioner has also failed to demonstrate any prejudice that would have flowed from this alleged ineffective assistance. Sentence review under § 51-195 can result in either a "decrease or increase of the term within the limits fixed by law. . . ." Thus, the appropriate defense strategy might have been to avoid sentence review altogether at all times in this case. We cannot hold, on the state of the record before us, that an attorney of ordinary skill in the practice of criminal

law would have filed an application for sentence review at any point following imposition of this sentence.

We also note that the petitioner's record on appeal before this court is devoid of any indication that he has ever applied for sentence review on the basis of *State* v. *Anderson,* supra, 220 Conn. 400. Therefore, we are not persuaded by his argument that he lost a right for which he has not applied.

The judgment is affirmed.

In this opinion the other judges concurred.