******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* TERI A. BUHL
(SC 19412)
(SC 19413)

Palmer, Zarella, Eveleigh, McDonald, Espinosa and Robinson, Js.

*Argued January 19—officially released June 21, 2016*

*Jonathan M. Sousa*, special deputy assistant state's attorney, with whom, on the brief, were *David I. Cohen*, state's attorney, and *Donna M. Krusinski*, assistant state's attorney, for the appellant in Docket No. SC 19412 and the appellee in Docket No. SC 19413 (state).

*Stephan E. Seeger*, with whom, on the brief, was *Igor Kuperman*, for the appellee in Docket No. SC 19412 and the appellant in Docket No. SC 19413 (defendant).

*Opinion*

ROBINSON, J. These two certified appeals are brought, respectively, by the state and the defendant, Teri A. Buhl, from the judgment of the Appellate Court, which reversed the defendant's conviction for breach of the peace in the second degree and affirmed her conviction for harassment in the second degree. *State* v. *Buhl*, 152 Conn. App. 140, 161, 100 A.3d 6 (2014). In its appeal, the state claims that the Appellate Court improperly concluded that there was insufficient evidence to support the defendant's breach of the peace conviction. In her appeal, the defendant claims that the Appellate Court improperly: (1) concluded that there was sufficient evidence to support her harassment conviction; and (2) declined to consider her constitutional claims on the ground that they were inadequately briefed. We affirm in part and reverse in part the judgment of the Appellate Court. Specifically, we conclude that the Appellate Court: (1) improperly determined that there was insufficient evidence to support the defendant's breach of the peace conviction; (2) properly concluded that there was sufficient evidence to support her harassment conviction; and (3) did not abuse its discretion in determining that her constitutional claims were inadequately briefed.

The record reveals the following facts and procedural history. In June, 2010, the defendant, a journalist, was involved in a romantic relationship with P and working on an investigative story about underage drinking.[1] The defendant had been dating P for two years, and she frequently visited P's home, often several times per week. P was divorced, and M, his seventeen year old daughter from his previous marriage, resided with him for one half of each week. M testified that her relationship with the defendant was "tense" and "uncomfortable." M kept handwritten diary entries in a drawer of a nightstand in her bedroom at P's home.

On June 23, 2010, the night of M's high school graduation, M received a telephone call from a friend, B, who stated that he had seen a "fake" profile on Facebook, a social networking website, with posts about her.[2] Because B had received and accepted a friend request from the person who had created the fictitious account, M logged into Facebook through B's account to view the posts. M located the profile, which was created under the name "Tasha Moore." The profile contained a post that read: "[M] gets so drunk at parties that boys know she is an easy hook up. In April . . . she gave [O] a blow job [at a party] and then threw up. [O] calls her that deep throat JAP.[3] [M] told her friends she thought giving the best [blow job] would help make [O] her boyfriend. You wonder why some [of the] girls [at M's high school] never learn how to behave around boys." (Footnote added.) That post also contained a photograph of M. A second post contained six photo-

graphs of diary entries from M's nightstand, which the author of the post called M's "[c]onfession [l]etter." The diary entries described M drinking alcohol at a party and performing oral sex on a boy. Although "Tasha Moore" sent friend requests to seven or eight of M's friends from school, several of whom accepted the requests, she did not send a friend request to M herself. M was too upset to go out that night to celebrate her graduation. She continued to receive telephone calls from "most people" she knew from school that night asking about the posts.

On the morning of June 24, 2010, M sent a message to "Tasha Moore" via Facebook asking her to take down the posts and warning her that, if they were not removed, she would go to the police. When the posts remained on Facebook, M brought copies of them to the police station and explained what had happened to Officer Daniel Gulino. M then told her parents what had happened.

Later that afternoon, P received an anonymous envelope, sent by overnight mail, which contained copies of M's diary entries—the same ones that had been posted on Facebook.[4] A typed, unsigned cover letter read as follows: "[P], I am a casual friend of your daughter [M]. I told my mom about the story you'll read in this letter that [M] shared with us this spring and she said I should share it with you. [O], the guy [M] hooked up with, has been bragging to my boyfriend and other senior guys about what [M] did with him that night. He's not really a nice guy. She just gets so drunk so fast sometimes I don't know if she even remembers hooking up with guys. I know she wanted [O] to be her boyfriend but he hardly talked to her after that night. She only showed a few of us these letters . . . . Please don't tell her one of her friends wrote you but my [m]om said it is best if you read them." P and M returned to the police station with these materials.

The next night, on June 25, 2010, P had dinner with the defendant and told her about these events. He explained how "shocked" he was that such a "crazy thing" was going on, and stated that a police investigation was pending. P "got no reaction" from the defendant. Two days later, however, the defendant told P that she had sent the anonymous mailing. She explained that a friend of M's had contacted her because she was concerned about M, and the friend had produced copies of M's diary entries. The defendant claimed that she convinced that friend to turn the copies over to her along with a cover letter explaining the circumstances. When P asked for the friend's name, the defendant refused to reveal that information, stating that she had promised to keep it confidential.

P informed Officer Gulino of the identity of the anonymous mailer. At this point, Officer Gulino already had concluded that the person who took M's diary entries

was someone P or M knew, because the doors to P's home were kept locked and there were no signs of forced entry. When Officer Gulino spoke with the defendant over the telephone, she told him that she was doing an investigative story on underage drinking in the area, but "adamantly denied" posting M's diary entries on Facebook. When asked if she was "Tasha Moore," the defendant responded, "I'm Teri Buhl, not Tasha Moore." Officer Gulino then turned the investigation over to Sergeant Carol Ogrinc.

Sergeant Ogrinc served an ex parte order on Facebook for the disclosure of the Internet Protocol address (IP address) associated with the "Tasha Moore" profile. After receiving this information, Sergeant Ogrinc then served an ex parte order on Cablevision, an Internet service provider, seeking the disclosure of the person associated with the IP address she was investigating. Cablevision reported that person was the defendant. See footnote 19 of this opinion.

The defendant was subsequently arrested and charged, relevant to these appeals, with breach of the peace in the second degree in violation of General Statutes § 53a-181 (a) (4), and harassment in the second degree in violation of General Statutes § 53a-183 (a) (2).[5] The state alleged that the defendant committed harassment by posting M's diary entries on Facebook or sending the anonymous mailing to P. The state based the breach of the peace charge on the Facebook posts only. After a court trial, the court convicted the defendant of both offenses, and sentenced her to a total effective sentence of nine months incarceration, execution suspended after thirty days, followed by one year of probation.[6]

The defendant appealed from both convictions to the Appellate Court, claiming that there was insufficient evidence to support her breach of the peace conviction because the state had not proven that: (1) the Facebook posts were "publicly exhibit[ed]"; (2) she posted M's diary entries on Facebook; or (3) she intended to "inconvenience, [annoy] or alarm" M by posting the diary entries on Facebook. General Statutes § 53a-181 (a). The defendant further contended that there was insufficient evidence to support her harassment conviction, based on the anonymous mailing, because the state had not proven that she intended to "harass, annoy or alarm" P or M by sending the mailing.[7] General Statutes § 53a-183 (a) (2). Embedded within these sufficiency arguments, the defendant also asserted several constitutional claims based on the first amendment to the United States constitution and the due process clause set forth in the fourteenth amendment to the United States constitution.

The Appellate Court determined that the defendant had properly set forth sufficiency arguments with respect to both convictions, but had not adequately

briefed her constitutional claims. *State* v. *Buhl*, supra, 152 Conn. App. 151. The Appellate Court concluded that there was insufficient evidence to support her breach of the peace conviction because the state had not proven that the Facebook posts were publicly exhibited. Id., 155. The Appellate Court did not address the defendant's arguments with respect to the other elements of the crime. Id., 155 n.7. In reviewing the defendant's harassment conviction, the Appellate Court concluded that sufficient evidence demonstrated her intent to "harass, annoy or alarm" P or M by sending the anonymous mailing. Id., 154. The Appellate Court, therefore, reversed the defendant's breach of the peace conviction and affirmed her harassment conviction. Id., 161. These certified appeals followed. Additional facts and procedural history will be set forth as necessary.

I

The state claims in its appeal that the Appellate Court improperly concluded that there was insufficient evidence to prove that the Facebook posts were publicly exhibited with respect to defendant's breach of the peace conviction. In response, the defendant argues to the contrary. We agree with the state. We further conclude that the breach of the peace conviction must be reinstated because the trial court reasonably could have found that the state had met its burden of proving the other elements of the crime at trial, namely, that: (1) the defendant was the person who posted M's diary entries on Facebook; and (2) the defendant intended to "inconvenience, [annoy] or alarm" M by posting her diary entries on Facebook. General Statutes § 53a-181 (a). The state preemptively raises these claims in the event that we agree that there was sufficient evidence to prove that the Facebook posts were publicly exhibited.[8]

The parties do not dispute that our well known standard of review for sufficiency of the evidence claims applies to these appeals, both as to the construction to be given the evidence at trial and the inferences that can be drawn from that evidence. See *State* v. *Davis*, 283 Conn. 280, 329–30, 929 A.2d 278 (2007); see also *State* v. *Drupals*, 306 Conn. 149, 157, 49 A.3d 962 (2012).

A

The state first claims that the Appellate Court improperly concluded that there was insufficient evidence demonstrating that the Facebook posts were "publicly" exhibited, as required by § 53a-181 (a) (4).[9] Specifically, the state argues that the Appellate Court improperly determined that expert testimony was required to prove the public nature of the posts and, in doing so, relied too heavily on a comment by the trial court expressing its unfamiliarity with Facebook, and failed to give proper deference to the trial court's factual findings and credibility determinations. The defendant argues in response that the Appellate Court properly determined

that expert testimony was required to prove the public nature of the posts, given the trial court's lack of knowledge of Facebook, and properly determined that M's testimony on this point was contradictory. We agree with the state, and conclude that there was sufficient evidence of a public exhibition of the Facebook posts at trial.

The record reveals the following additional facts and procedural history. The state's evidence regarding the public nature of the Facebook posts came primarily from M's testimony. Toward the beginning of her testimony, when the issue of Facebook arose, the trial court stated, "I should forewarn counsel, I don't keep a Facebook page, so please feel free to explain the significance of different Facebook issues as we get to them because I will not necessarily appreciate them." (Internal quotation marks omitted.) Id., 158. M subsequently explained how to "friend" someone on Facebook—by sending them a friend "request" or invitation to become friends—and how, if the person accepts the request, the two users become Facebook "friends." M further explained that a user's profile may be accessible to the public, or only to his or her network of "friends," depending on the user's privacy settings. See footnote 2 of this opinion. Specifically, with respect to the "Tasha Moore" profile, M testified that she initially viewed the profile through the account of B, who had become friends with "Tasha Moore," but later viewed the exact same content through her own profile, even though she had never become friends with "Tasha Moore." Because M could access the posts without becoming friends with "Tasha Moore," M stated her belief that the profile was "unprivate" and, thus, any member of the public could view the profile and the posts about M.

The Appellate Court concluded that this evidence was insufficient to establish that the Facebook posts were publicly exhibited[10] for two primary reasons: (1) expert testimony[11] was required to establish the public nature of the posts, given the trial court's apparent unfamiliarity with Facebook; and (2) M's testimony on this point was contradictory. *State* v. *Buhl*, supra, 152 Conn. App. 156–61. We find these rationales unavailing for the reasons explained subsequently in this opinion.

1

The Appellate Court first stated that expert testimony was required to demonstrate that the posts were publicly exhibited, in light of the trial court's inexperience with Facebook. Id., 160–61. Expert opinions "concerning scientific, technical or other specialized knowledge" may be necessary to "assist the trier of fact in understanding the evidence or in determining a fact in issue." Conn. Code Evid. § 7-2. "Although expert testimony may be helpful in many instances, it is required only when the question involved goes beyond the field of ordinary knowledge and experience of the trier of fact.

. . . The trier of fact need not close its eyes to matters of common knowledge solely because the evidence includes no expert testimony on those matters." (Internal quotation marks omitted.) *State* v. *Smith*, 273 Conn. 204, 211, 869 A.2d 171 (2005). "Whether expert testimony is required in a particular case is determined on a case-by-case basis and its necessity is dependent on whether the issues are of sufficient complexity to warrant the use of the testimony as assistance to the . . . court." *Johnson* v. *Commissioner of Correction*, 34 Conn. App. 153, 158, 640 A.2d 1007, cert. denied, 229 Conn. 919, 644 A.2d 914 (1994).

Regardless of any comments by the trial court, the elementary Facebook concepts in the present case did not go beyond "the field of ordinary knowledge and experience" of an objective trier of fact. *State* v. *Smith*, supra, 273 Conn. 211. The prevalence of Facebook use in American society cannot be reasonably questioned. Indeed, a 2015 survey performed by the Pew Research Center reveals that 72 percent of American adults that use the Internet also use Facebook. Pew Research Center, "The Demographics of Social Media Users," (2015) available at http://www.pewinternet.org/2015/08/19/the-demographics-of-social-media-users (last visited May 25, 2016); see also *Vincent* v. *Story County*, United States District Court, Docket No. 4:12CV00157 (RAW) (S.D. Iowa January 14, 2014) ("[t]he use of . . . social media like Facebook is an ever increasing way people speak to each other in the twenty-first century"); *State* v. *Craig*, 167 N.H. 361, 369, 112 A.3d 559 (2015) ("Facebook and other social media sites are becoming the dominant mode of communicating directly with others, exceeding e-mail usage in 2009"); *Forman* v. *Henkin*, 134 App. Div. 3d 529, 543, 22 N.Y.S.3d 178 (2015) ("Facebook and other similar social networking sites are so popular that it will soon be uncommon to find a . . . [person] who does not maintain such an on-line presence"). Nor were they "technically complex issue[s]" requiring expert testimony. *River Bend Associates, Inc.* v. *Conservation & Inland Wetlands Commission*, 269 Conn. 57, 78, 848 A.2d 395 (2004); see also *Graziosi* v. *Greenville*, 985 F. Supp. 2d 808, 810 (N.D. Miss. 2013) ("Facebook claims to enable 'fast, easy, and rich communication' "), aff'd, 775 F.3d 731 (5th Cir. 2015); *United States* v. *Amaya*, 949 F. Supp. 2d 895, 912 (N.D. Iowa 2013) ("Facebook offers . . . an affordable, easy, and extremely viable option to seek information"); *Olson* v. *LaBrie*, Docket No. A11-558, 2012 WL 426585, *1 (Minn. App. February 13, 2012) (process for finding users on Facebook "simple"), review denied (Minn. April 17, 2012); *Smith* v. *State*, 136 So. 3d 424, 432 (Miss. 2014) (creating Facebook account "easy"). M, as defense counsel acknowledged at trial, uses Facebook and is familiar with its basic functionalities. She could, therefore, explain simple Facebook concepts to the court, such as "friending" someone and the site's gen-

eral privacy settings.[12] See, e.g., *State* v. *Inkton*, Docket No. 102706, 2016 WL 762580, *13 (Ohio February 25, 2016) (detective "familiar with Facebook" could testify on "the difference between Facebook accounts that are open to the public and private accounts [and] using privacy settings to restrict the information that is available to the public"); *People* v. *Glover*, 363 P.3d 736, 746 (Colo. App. 2015) (detective's Facebook testimony not result of "any specialized knowledge," but based on experience and "knowledge common among ordinary people using, or considering the use of, Facebook"), cert. denied, Docket No. 15SC277, 2015 WL 7987958 (Colo. December 7, 2015).

Moreover, M's testimony that she could view the profile of "Tasha Moore" through her own account, even though she was never friends with "Tasha Moore," was based on her individual perceptions of the profile, and not on any "specialized knowledge . . . ." Conn. Code Evid. § 7-2. The question of whether the profile was open to the public therefore became a determination based on M's credibility.[13] See *State* v. *Gaps*, Docket No. 109423, 2014 WL 113465, *4 (Kan. App. 2014) (evidence supported defendant's violation of probation condition that his Facebook profile remain open to public when lay witness testified that she could not find his profile as public user), review denied (Kan. January 8, 2015); *Olson* v. *LaBrie*, supra, 2012 WL 426585, *1 (lay witness testified that any member of public could access Facebook profile). The trial court acknowledged as much, stating twice that the issue of the public nature of the posts came down to whether the court believed M's testimony that she was never friends with "Tasha Moore" and could view the posts through her own account.

The trial court's comment at the beginning of the trial expressing its unfamiliarity with Facebook did not otherwise create a need for expert testimony.[14] The trial court made this comment only a few minutes into the testimony of M, who was the state's first witness to discuss Facebook. Thereafter, the trial court gained knowledge of the relevant Facebook concepts through the evidence admitted in the case. M explained the concept of "friending" someone, the general workings of Facebook's privacy settings, and how one may determine whether a person's profile is public or private based on whether a user who is not a friend can view the profile. The state reiterated these matters in its closing argument. The trial court, further, ensured its understanding of the relevant Facebook concepts by interjecting at different points throughout the proceedings to ask questions.[15] The Appellate Court concluded that these questions revealed the trial court's lack of knowledge of Facebook. *State* v. *Buhl*, supra, 152 Conn. App. 159–60. We disagree. Rather, they demonstrate that the trial court appropriately learned the concepts relevant to the proceedings throughout the trial.[16]

The Appellate Court's second reason for concluding that M's testimony was insufficient to establish the public nature of the Facebook posts was that M's testimony on that point was contradictory. Id., 160. The Appellate Court focused on the following exchange between M and defense counsel on cross-examination:

"Q. So . . . you were never friends with Tasha Moore?

"A. Yes, but her page was unprivate.

"Q. Okay, you never became friends with Tasha Moore?

"A. You could see it. No, but I have gone on through [my friend's] Facebook and had seen it through his page.

"Q. Thank you. You went on through your friend's Facebook page to see it?

"A. Yes. Then could see everything through mine.

"Q. I understand it. But, you weren't invited in and you didn't see it from anyone else's page but [your friend's]?

"A. Right, everybody else had been invited except me.

"Q. Okay, everybody else, all eight other people or all seven or eight people?

"A. Multiple people had been invited, [but] not everybody accepted.

"Q. All right. So, it's a private invitation. You have to be invited in?

"A. Sure." (Internal quotation marks omitted.) Id., 156.

The Appellate Court determined that this testimony was contradictory. Id. We, however, like the trial court, see no inconsistency in this testimony. In the first half of this exchange, M stated that she viewed "Tasha Moore's" profile through a friend's account *and* through her own account, though she was never friends with "Tasha Moore." She subsequently responded to a compound leading question that contained two assertions, namely that: (1) she had not been "invited" to become friends with "Tasha Moore"; and (2) she had not viewed "Tasha Moore's" profile through anyone's Facebook account other than B's. M answered "[r]ight," but clarified that she was only responding to the first assertion by stating that "everybody else had been invited except me." Defense counsel then asked another two part leading question, asserting that: (1) Facebook friend requests are "private invitation[s]," which only the invitee can view; and (2) one must be "invited in" to view a user's profile, or, perhaps, the "Tasha Moore" profile specifically. It is unclear to which assertion M directed her answer of "sure." Regardless, our review of the trial transcript makes clear that the trial court subsequently

resolved, to its satisfaction, any ambiguity in this portion of M's testimony.[17]

In particular, the trial court evinced its understanding of M's testimony as being that she could view the posts through her own account even though she was never friends with "Tasha Moore." During closing arguments, when defense counsel continued to argue that the posts were "private," the court inquired:

"The Court: Didn't . . . she say that she saw [the profile] initially signing in [through a friend's account]?

"[Defense Counsel]: Yes.

"The Court: And then later she was able to see it . . . signing in as herself, or as a member of the public?

"[Defense Counsel]: She did say . . . .

"The Court: So there I think the issue is credibility.

"[Defense Counsel]: Correct."

Most tellingly, at the hearing on the defendant's post-verdict motions, prior to her sentencing, the trial court expressly rejected the notion that M's testimony was unclear as to whether the posts were publicly accessible. The court inquired of defense counsel as follows:

"The Court: Wasn't there testimony by [M] that she was not friended? That she viewed this not only . . . using the Facebook page of a friend who had been friended, but that she directly viewed this under her own identity ? . . .

"[Defense Counsel]: [T]here was . . . testimony, I think, that was unclear. . . .

"The Court: *How is that unclear*? . . . You cited the first part of her testimony, where she said that she went through her friend's account. I don't believe you cited her subsequent testimony where she said, *I saw it using my own identity*—

"[Defense Counsel]: Oh that, yeah.

"[The Court]:—and [that M] wasn't friended." (Emphasis added.)

By relying upon arguable inconsistencies in M's testimony that the trial court did not, the Appellate Court failed to "construe the evidence in the light most favorable to sustaining the verdict" and give proper deference to the trial court's factual findings and credibility determinations. (Internal quotation marks omitted.) *State* v. *Davis*, supra, 283 Conn. 329. "This court cannot substitute its own judgment for that of the [finder of fact] . . . ." *State* v. *Revels*, 313 Conn. 762, 778, 99 A.3d 1130 (2014), cert. denied,     U.S.    , 135 S. Ct. 1451, 191 L. Ed. 2d 404 (2015). "Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence

is to be considered in the light most favorable to the prosecution." (Emphasis omitted.) *Jackson* v. *Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979).

Even if there were inconsistencies in M's testimony, "[i]t is the exclusive province of the trier of fact to weigh conflicting testimony and make determinations of credibility, crediting some, all or none of any given witness' testimony." (Internal quotation marks omitted.) *State* v. *Allen*, 289 Conn. 550, 559, 958 A.2d 1214 (2008); see also, e.g., *State* v. *Alfonso*, 195 Conn. 624, 633–34, 490 A.2d 75 (1985) (jury entitled to believe witness even though testimony was "varied and contradictory"). "It is not our role to reevaluate the credibility of witnesses or to overturn factual findings of a [trial] court unless they are clearly erroneous." *Ramos* v. *Commissioner of Correction*, 67 Conn. App. 654, 659, 789 A.2d 502, cert. denied, 260 Conn. 912, 796 A.2d 558 (2002); see also *State* v. *Krijger*, 313 Conn. 434, 447, 97 A.3d 946 (2014) ("we accept all . . . credibility determinations and findings [of the trial court] that are not clearly erroneous"). "If there is any reasonable way that the [trier of fact] might have reconciled the conflicting testimony before [it], we may not disturb [its] verdict." (Internal quotation marks omitted.) *State* v. *Allen*, supra, 559. In the present case, we see no reason to disturb the trial court's finding that M's testimony was consistent and credible on this point.[18]

### B

Given our conclusion that the trial court reasonably could have found that the state had proven the public element of the crime of breach of the peace, we next consider the state's contentions that the conviction on that charge must be reinstated because sufficient evidence supports the trial court's findings that: (1) it was the defendant who posted M's diary entries on Facebook under the guise of "Tasha Moore"; and (2) the defendant intended to "inconvenience, [annoy] or alarm" M by posting her diary entries on Facebook. Rather than remand these issues to the Appellate Court for consideration in the first instance, we review them in the interests of judicial economy. See footnote 8 of this opinion. We address each in turn.

### 1

The state first claims that there was sufficient evidence that the defendant was the person who posted M's diary entries on Facebook. The defendant argues in response that the state did not present direct evidence linking her to the "Tasha Moore" Facebook profile and that the circumstantial evidence in the case fell short of establishing this element beyond a reasonable doubt. We agree with the state, and conclude that there was sufficient circumstantial evidence proving the defendant's identity as the Facebook poster.

Before reviewing the evidence, we note that a fact

finder's "factual inferences that support a guilty verdict need only be reasonable." (Internal quotation marks omitted.) *State* v. *Allen*, supra, 289 Conn. 556. Although "the [finder of fact] must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Stephen J. R.*, 309 Conn. 586, 593, 72 A.3d 379 (2013). "[T]he line between permissible inference and impermissible speculation is not always easy to discern. When we infer, we derive a conclusion from proven facts because such considerations as experience, or history, or science have demonstrated that there is a likely correlation between those facts and the conclusion. If that correlation is sufficiently compelling, the inference is reasonable. But if the correlation between the facts and the conclusion is slight, or if a different conclusion is more closely correlated with the facts than the chosen conclusion, the inference is less reasonable. At some point, the link between the facts and the conclusion becomes so tenuous that we call it speculation. When that point is reached is, frankly, a matter of judgment." (Internal quotation marks omitted.) *State* v. *Copas*, 252 Conn. 318, 339, 746 A.2d 761 (2000).

The following evidence and reasonable inferences support the trial court's finding that the defendant was the person behind the "Tasha Moore" profile and the posts about M. The defendant visited P's home frequently, often several times each week, and M kept diary entries in her bedroom in P's home. The police suspected that the person who took the diary entries was someone with access to P's home, because the doors to the home were kept locked and there were no signs of forced entry. Although M's friends had access to P's home, M testified that only her close friends would come over, and that she felt she could share anything with them. Moreover, the diary entries were posted on Facebook during M's graduation ceremony, which most of her friends attended.

The trial court could reasonably infer that the defendant possessed the diary entries when they were posted on Facebook. The defendant admitted to sending the anonymous mailing, and she, therefore, possessed the diary entries at one time. Given the timing of the Facebook posts and mailing, the trial court could further infer that she possessed them when they were posted on Facebook. The diary entries were posted on Facebook on June 23, 2010, at approximately 6 p.m. and P received the mailing with the diary entries the following day by overnight mail. Thus, the trial court could reasonably infer that the defendant possessed the diary entries on the night of June 23.

The trial court could also reasonably infer that the

defendant had a motive to commit the crime. Consistent with her theory of defense, the defendant testified that she was working on an investigative story about underage drinking at the time, and the diary entries concerned a seventeen year old girl drinking at a party. Additionally, M testified that she had a "tense" and "uncomfortable" relationship with the defendant, and that she believed that the defendant tried to "make [her] life miserable." P confirmed that M and the defendant never had a close relationship.

The defendant, however, points to the fact that she had a financially beneficial, nontumultuous relationship with P and, thus, no motive to harm P or M. Indeed, P and the defendant had been dating for more than two years by June, 2010, and P helped pay for her apartment and living expenses. P testified that their relationship was "good" with no long periods of animosity, that P trusted her, and that they had an "open line of communication." M testified that P and the defendant "got along fine" and that she did not perceive any tension between them.

This evidence related to the quality of the relationship between P and the defendant, however, does not diminish the reasonableness of the inference that the trial court did make, namely, that the defendant had a motive to commit the crime based on her troubled relationship with M. "In evaluating evidence that could yield contrary inferences, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier [of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [trier of fact's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Drupals*, supra, 306 Conn. 158. Here, considering all the evidence "in the light most favorable to the prosecution"; *Jackson* v. *Virginia*, supra, 443 U.S. 319; the trial court could reasonably infer that the defendant's motive to create the Facebook posts and make M's life "miserable" outweighed her desire to maintain her advantageous relationship with P.

Lastly, the trial court could reasonably infer that the defendant attempted to conceal her role as the Facebook poster by hiding her identity as the anonymous mailer. First, the defendant sent the copies of the diary entries anonymously, rather than approaching P directly. Then, when P explained what had happened to the defendant on June 25, he "got no reaction" from her. It was not until two days later that the defendant admitted to sending the mailing. Cf. *State* v. *Oliveras*, 210 Conn. 751, 759, 557 A.2d 534 (1989) ("[e]vidence

that an accused has taken some kind of evasive action to avoid detection for a crime, such as flight [or] concealment of evidence . . . is ordinarily the basis for a charge on the inference of consciousness of guilt").

The defendant responds that she concealed her identity as the anonymous mailer in order to protect her source, and later revealed her role in the situation to alleviate some of P's concerns. Again, however, we cannot say that the defendant's proposed inference that she concealed her identity as the anonymous mailer in order to protect her source is so much "more closely correlated with the facts"; (internal quotation marks omitted) *State* v. *Copas*, supra, 252 Conn. 339; that it renders unreasonable the trial court's conclusion that she was, instead, trying to avoid detection as the Facebook poster. "[P]roof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal." (Internal quotation marks omitted.) *State* v. *Davis*, supra, 283 Conn. 330.

The defendant further argues that this circumstantial evidence, and the reasonable inferences that flow therefrom, are insufficient to prove that she posted the diary entries on Facebook beyond a reasonable doubt. She relies heavily on her claim that the state never produced direct evidence affirmatively linking her IP address to the one associated with the "Tasha Moore" profile.[19] The state did not, however, need direct evidence to prove that the defendant posted M's diary entries on Facebook. We have repeatedly acknowledged that "it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence." (Internal quotation marks omitted.) *State* v. *Davis*, supra, 283 Conn. 330. The circumstantial evidence in this case, discussed previously, is sufficient to prove that the defendant posted M's diary entries on Facebook. Construing the evidence in the light most favorable to sustaining the verdict, we conclude that the trial court reasonably could have found that the cumulative force of this evidence established this element of the crime beyond a reasonable doubt. See *State* v. *Stovall*, 316 Conn. 514, 520, 115 A.3d 1071 (2015).

2

Second, the state claims that there was sufficient evidence that the defendant intended to "inconvenience, [annoy] or alarm" M by posting her diary entries on Facebook. General Statutes § 53a-181 (a). In response, the defendant argues, inter alia, that the Facebook posts do not evince this intent because M, herself,

was not invited to view them. We agree with the state, and conclude that there was sufficient evidence to demonstrate the defendant's intent to inconvenience, annoy, or alarm M by posting her diary entries on Facebook.

The crime of breach of the peace requires proof that the defendant publicly exhibited offensive, indecent, or abusive matter concerning any person with the intent to cause "inconvenience, annoyance or *alarm* . . . ."[20] (Emphasis added.) General Statutes § 53a-181 (a). More precisely, the defendant must have the "predominant intent . . . to cause what a reasonable person operating under contemporary community standards would consider a disturbance to or impediment of a lawful activity, a deep feeling of vexation or provocation, or a feeling of anxiety prompted by threatened danger or harm." (Internal quotation marks omitted.) *State* v. *Wolff*, 237 Conn. 633, 670, 678 A.2d 1369 (1996).

"A person acts 'intentionally' with respect to a result . . . when his conscious objective is to cause such result . . . ." General Statutes § 53a-3 (11); see also, e.g., *State* v. *Nash*, 316 Conn. 651, 671–72, 114 A.3d 128 (2015). "[T]he question of intent is purely a question of fact." (Internal quotation marks omitted.) *State* v. *Hedge*, 297 Conn. 621, 658, 1 A.3d 1051 (2010). "[T]he state of mind of one accused of a crime is often the most significant and, at the same time, the most elusive element of the crime charged. . . . Because it is practically impossible to know what someone is thinking or intending at any given moment, absent an outright declaration of intent, a person's state of mind is usually [proven] by circumstantial evidence . . . ." (Internal quotation marks omitted.) *State* v. *Bonilla*, 317 Conn. 758, 766, 120 A.3d 481 (2015).

In the present case, the state proved the mental state element of the crime of breach of the peace by demonstrating that the defendant specifically intended to cause M "a deep feeling of vexation or provocation" by posting her diary entries on Facebook. (Internal quotation marks omitted.) *State* v. *Wolff*, supra, 237 Conn. 670. The language of, and circumstances surrounding, the posts are sufficient to demonstrate beyond a reasonable doubt her intent to achieve this result. The defendant posted M's private diary entries, which she found in M's nightstand in her bedroom, publicly online. These diary entries expressed M's private thoughts, which were not only deeply personal, but of a sexual and embarrassing nature. They describe M drinking heavily at a party, performing oral sex on a boy, and developing a crush on the boy. The posts specifically named M as the author of the diary entries and included a photograph of her. The posts then insulted her, calling her an "easy hook up," and relayed O's mockery of her as a "deep throat JAP." Seven or eight of M's friends and classmates were invited to view these posts.

The trial court could have reasonably found that post-

ing a person's private diary entries online and insulting him or her in this manner would reasonably "vex" or "provo[ke]" the person. *State* v. *Wolff*, supra, 237 Conn. 670. "[V]ex" is generally defined as "to bring trouble, distress, or agitation . . . ." Merriam-Webster's Collegiate Dictionary (11th Ed. 2003). A fact finder reasonably could determine that M would be "vexed" by the fact that someone had been in her bedroom and rifled through her belongings, not to mention the fact that many of her friends and classmates could view her private thoughts about her experiences with sex and alcohol. Moreover, a person might reasonably be "provo[ked]" by this intrusive act and the insults contained in the posts.[21] *State* v. *Wolff*, supra, 670; see also *Gilles* v. *State*, 531 N.E.2d 220, 223 (Ind. App. 1988) (insults insinuating, inter alia, that person had sexually transmitted disease were "inherently likely to provoke a violent reaction" and supported disorderly conduct conviction).[22]

The defendant argues, however, that this evidence is insufficient to demonstrate an intent to cause M "a deep feeling of vexation or provocation" because M, herself, was not invited to view the posts.[23] This argument is unpersuasive, however, because the posts were unquestionably directed at M. The posts: (1) stated her first and last name, where she went to high school, and her graduation year; (2) contained her signed diary entries; and (3) included a photograph of her. The offensive remarks also specifically targeted M and no one else. Although M did not receive a friend request, seven or eight of her friends and classmates did, which inevitably led to her awareness of the postings.[24] For these reasons, we conclude that the trial court reasonably could have concluded that the state had proven the defendant's intent to "inconvenience, [annoy] or alarm" M by posting her diary entries on Facebook beyond a reasonable doubt. General Statutes § 53a-181 (a).

II

We now turn to the defendant's appeal from the Appellate Court's judgment affirming her harassment conviction. The defendant argues that the Appellate Court improperly: (1) concluded that there was sufficient evidence to support her harassment conviction; and (2) declined to consider her constitutional claims with respect to both convictions on the ground that they were inadequately briefed. We address each claim in turn.

A

The defendant first claims that the Appellate Court improperly concluded that there was sufficient evidence to support her harassment conviction because the state did not prove beyond a reasonable doubt her intent to "harass, annoy or alarm" P or M by sending the anonymous mailing. General Statutes § 53a-183 (a)

(2). Specifically, she argues that the mailing shows concern for M, rather than an intent to harass P or M. The state responds that, in light of the anonymous nature of the mailing, the contents of the mailing, and the defendant's behavior thereafter, the trial court reasonably could have found that the defendant intended to harass P or M beyond a reasonable doubt. We agree with the state.

The crime of harassment in the second degree is a specific intent crime. *State* v. *Snyder*, 40 Conn. App. 544, 551–52, 672 A.2d 535, cert. denied, 237 Conn. 921, 676 A.2d 1375 (1996). The state must prove that the defendant communicated with the intent to "harass, annoy or alarm" a person "in a manner likely to cause annoyance or alarm . . . ." General Statutes § 53a-183 (a) (2). The defendant need not engage "in a direct communication with the person whom he [or she] intended to harass." *State* v. *Snyder*, supra, 552.

"[I]ntent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom." (Internal quotation marks omitted.) *State* v. *Simmons*, 86 Conn. App. 381, 387, 861 A.2d 537 (2004), cert. denied, 273 Conn. 923, 871 A.2d 1033, cert. denied, 546 U.S. 822, 126 S. Ct. 356, 163 L. Ed. 2d 64 (2005). "Evidence of the language used in an alleged violation of the harassment statute is [also] relevant to show the intent of the accused in making the [communication] as well as the likelihood of its causing annoyance or alarm." *State* v. *Lewtan*, 5 Conn. App. 79, 83, 497 A.2d 60 (1985).

In the present case, the trial court reasonably could have found that the circumstances surrounding the mailing, the contents of the mailing, and the defendant's behavior thereafter demonstrate beyond a reasonable doubt her intent to harass, annoy, or alarm P or M through the mailing. The defendant could have brought the diary entries to P, her boyfriend of more than two years, directly, but she instead, as she admitted, sent them anonymously. The anonymous nature of the mailing served to increase P's and M's anxieties because they did not know who had intruded into M's bedroom and copied her diary entries, how the mailer had obtained the entries, or who else might have access to them.[25] P, in fact, testified that he felt "violated" that M's diary entries were in "someone else's hands."

Moreover, when the defendant had the opportunity to admit to sending the mailing, she did not do so, and instead hid this information for another two days. On June 25, 2010, P explained to the defendant what had happened, including his receipt of the anonymous mailing, stating how "shocked" he was that such a "crazy thing" was going on. He, however, "got no reaction" from the defendant. The defendant did not admit to sending the mailing until two days later, after learning that a police investigation was pending. Her delayed

confession prolonged P's and M's anxieties about the mailing, and further revealed her intention to harass them. The trial court reasonably could have declined to credit the defendant's explanation that she was trying to protect her "source"; see part I B 1 of this opinion; as equally unpersuasive in this context.

The contents of the mailing also show an intent to harass, annoy, or alarm P or M. The package contained copies of M's private diary entries, which described her drinking heavily at a party and performing oral sex on a boy. As the trial court noted, any parent receiving such a mailing would reasonably find it "incredibly distressful, disturbing, and abhorrent." P not only learned this information from a purportedly anonymous stranger, but realized that an unknown person had been in his home—specifically, his daughter's bedroom— rifled through her belongings, and made copies of her private diary entries. He was reasonably "shocked," "surprised," and "outraged" by the contents of the mailing, and felt "violated" that an unknown person had been in his home. Additionally, with respect to M, mailing such content to a person's parents could reasonably evince the intent to harass, annoy, or alarm that person, especially if the person is a minor. The defendant may also have had a motive to harass M based on their strained relationship. See part I B 1 of this opinion.

We acknowledge the defendant's argument that the cover letter from a "friend," if believed, could show concern for M and her well-being, rather than an attempt to harass P or M.[26] Cf. *Crews* v. *State*, 30 A.3d 120, 125 (Del. Fam. 2011) (concern over former husband's inappropriate behavior in front of child was "driving force" behind text message, rather than intent to harass). However, given the trial court's reasonable finding that the defendant copied M's diary entries and posted them on Facebook; see part I B 1 of this opinion; the court could reasonably infer that the defendant fabricated the letter to hide her prior misdeeds. Those acts "bear directly on [her] intent" in sending the mailing. *State* v. *Kantorowski*, 144 Conn. App. 477, 488–89, 72 A.3d 1228 (prior domestic violence incidents showed threats were not "mere jokes or pranks," because threatening statements "need[ed] to be understood in [the] context of [the] entire relationship" [internal quotation marks omitted]), cert. denied, 310 Conn. 924, 77 A.3d 141 (2013); see also *State* v. *Adgers*, 101 Conn. App. 123, 126–27, 921 A.2d 122 (previous "underlying history" of assaults showed perpetrator's intent to harass victim when he sent her notes stating that she "misle[d]" him, despite fact that notes were not threatening [internal quotation marks omitted]), cert. denied, 283 Conn. 903, 927 A.2d 915 (2007). The letter also does not change the disturbing contents of the mailing or the fact that someone, even an apparent "friend," had gone through M's nightstand, read her private diary entries, and made copies of them. We, therefore, con-

clude that the Appellate Court properly concluded that there was sufficient evidence to support the trial court's conclusion that the defendant intended to harass, annoy or alarm P or M by sending the anonymous mailing.

B

The defendant next claims that the Appellate Court improperly declined to consider her constitutional claims with respect to both convictions on the ground that those issues were inadequately briefed. She argues that her constitutional claims were adequately briefed because she stated the appropriate standards of review, cited relevant case law, and examined the relationship between the law and facts. In response, the state contends that the defendant's constitutional claims were very sparse, repetitive, confusing, and not contained in separate headings, as required by Practice Book § 67-4 (d). We agree with the state, and conclude that the Appellate Court did not abuse its discretion by determining that the defendant's constitutional claims were inadequately briefed.

The record reveals the following additional facts and procedural history. The defendant argued in her Appellate Court brief that there was insufficient evidence to support her convictions "without the trier of fact shifting the burden of proof on [her] and/or impermissibly impinging on her constitutional rights." Embedded within her sufficiency arguments, she claimed that: (1) her harassment conviction violated her rights under the first amendment because it was based on the content of her communications and not her conduct;[27] (2) both convictions violated her rights under the due process clause of the fourteenth amendment because the trial court impermissibly shifted the burden of proof to her to prove that she did not post the diary entries on Facebook; and (3) by requiring her to reveal her source to avoid the inference that she posted the diary entries on Facebook, the trial court infringed on her journalistic privilege not to reveal her source.[28] The Appellate Court observed that the defendant's arguments were "somewhat diffuse, with very little legal analysis as to the effect of many of the alleged errors made by the court." *State* v. *Buhl*, supra, 152 Conn. App. 149. The Appellate Court ultimately concluded that the defendant had asserted sufficiency of the evidence claims with respect to both convictions, but had inadequately briefed her constitutional claims. Id., 151.

"We repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." (Internal quotation marks omitted.) *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control*, 266 Conn. 108, 120, 830 A.2d 1121 (2003). "[F]or this court judiciously and efficiently to consider claims

of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs. . . . The parties may not merely cite a legal principle without analyzing the relationship between the facts of the case and the law cited." (Internal quotation marks omitted.) *State* v. *Claudio C.*, 125 Conn. App. 588, 600, 11 A.3d 1086 (2010), cert. denied, 300 Conn. 910, 12 A.3d 1005 (2011); see also *Getty Properties Corp.* v. *ATKR, LLC*, 315 Conn. 387, 413, 107 A.3d 931 (2015) (claim inadequately briefed when appellants undertook "no analysis or application of the law to the facts of [the] case").

This court has not previously determined the appropriate standard for reviewing the Appellate Court's determination that an issue has been inadequately briefed. In *Connecticut Coalition Against Millstone* v. *Connecticut Siting Council*, 286 Conn. 57, 85, 942 A.2d 345 (2008), however, this court applied an abuse of discretion standard in reviewing a trial court's decision not to review a claim because it was inadequately briefed, when the trial court was sitting in an appellate capacity.[29] We, therefore, agree with the state's contention that an abuse of discretion standard is similarly appropriate for reviewing the Appellate Court's determination that a claim has been inadequately briefed.[30] Accord *Alliance Partners, Inc.* v. *Voltarc Technologies, Inc.*, 263 Conn. 204, 210, 820 A.2d 224 (2003) ("[t]he rules of practice vest broad authority in the Appellate Court for the management of its docket" [internal quotation marks omitted]).

This deferential standard of review leads us to conclude that the Appellate Court did not abuse its discretion in determining that the defendant inadequately briefed her constitutional claims. The defendant devoted approximately one and one-half pages of her thirty-four page argument to her content versus conduct claim, three pages to her burden shifting due process claim, and one and one-half pages to her journalistic privilege claim.[31] Although the number of pages devoted to an argument in a brief is not necessarily determinative, relative sparsity weighs in favor of concluding that the argument has been inadequately briefed. This is especially so with regard to first amendment and other constitutional claims, which are often analytically complex. See, e.g., *Schleifer* v. *Charlottesville*, 159 F.3d 843, 871–72 (4th Cir. 1998) ("[f]irst [a]mendment jurisprudence is a vast and complicated body of law that grows with each passing day" and involves "complicated and nuanced constitutional concepts"), cert. denied, 526 U.S. 1018, 119 S. Ct. 1252, 143 L. Ed. 2d 349 (1999); *Missouri* v. *National Organization for Women, Inc.*, 620 F.2d 1301, 1326 (8th Cir.) (first amendment issues "complex"), cert. denied, 449 U.S. 842, 101 S. Ct. 122, 66 L. Ed. 2d 49 (1980); see also *In re Melody L.*, 290 Conn. 131, 154–55, 962 A.2d 81 (2009) (one and one-half page equal protection claim inadequate), overruled on other grounds by *State* v. *Elson*, 311 Conn. 726,

746–47, 91 A.3d 862 (2014); *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control*, supra, 266 Conn. 120 (claim under takings clause inadequately briefed when plaintiff provided "no authority or analysis in support of its specific claim"); *In re Shyliesh H.*, 56 Conn. App. 167, 181, 743 A.2d 165 (1999) (attempt to brief two constitutional claims in two and one-half pages inadequate).

Moreover, the briefing of the defendant's claims was not only short, but confusing, repetitive, and disorganized. Although she cited the appropriate standard of review and between three and six cases for each claim, she did not state the claims "clearly and succinctly," such that the Appellate Court could fully understand them. *Mullen & Mahon, Inc.* v. *Mobilmed Support Services, LLC*, 62 Conn. App. 1, 10 n.6, 773 A.2d 952 (2001); see *State* v. *Hawkins*, 366 P.3d 884, 898 (Utah App. 2016) ("[t]he inadequacy lies not in the quantity or the quality of the cited authority, but in the failure to analyze and apply that authority"). The defendant combined her three constitutional claims with her sufficiency of the evidence claims, several of which have different standards of review, in contravention of Practice Book § 67-4 (d), which requires that the brief's argument be "divided under appropriate headings into as many parts as there are points to be presented" and include "on each point . . . a separate . . . statement of the standard of review . . . ."[32] See also *Vertex, Inc.* v. *Waterbury*, 278 Conn. 557, 563 n.7, 898 A.2d 178 (2006) (noting that appellant "failed to place [the] arguments under appropriate headings and into separate parts of its brief" in declining to review inadequately briefed claim); *Herring* v. *Daniels*, 70 Conn. App. 649, 654–55 n.4, 805 A.2d 718 (2002) ("Rather than raising his claim separately . . . the [appellant] merely appends his argument to the end of his principal claim. . . . Because the [appellant] has failed to comply with [§ 67-4 (d)], we decline to review his claim."). The defendant then confusingly skipped back and forth between all of these claims throughout her brief. See *Birch* v. *Polaris Industries, Inc.*, 812 F.3d 1238, 1249 (10th Cir. 2015) (declining to review "vague, confusing, [and] conclusory" claim); *Ferg* v. *Ferg*, Docket No. 2005AP2841, 2006 WL 3437345, *3 (Wis. November 30, 2007) (declining to review "confusing" claim that was "not clearly presented"); see also *Hixson* v. *Wolfe*, Docket No. B242538, 2013 WL 6859846, *3 (Cal. App. December 31, 2013) (declining to review "disjointed and confusing" claim in brief that "lack[ed] subheadings and any sort of coherent organization"). Further, the defendant repeated these claims under four different headings, but cited the exact same authority and provided no new analysis.[33] See *State* v. *Grinde*, Docket No. A09-380, 2010 WL 154714, *2 (Minn. App. January 19, 2010) (declining to review repetitive claim). The defendant therefore fell well short of "[t]he goal of appellate coun-

sel . . . to create a document that leads the court through the logic of the advocate's position in a persuasive manner." *Mullen & Mahon, Inc.* v. *Mobilmed Support Services, LLC*, supra, 10 n.6.

The defendant argues that the Appellate Court nonetheless should have reviewed the defendant's constitutional claims because the state responded fully to them in its brief. See *State* v. *Howard F.*, 86 Conn. App. 702, 708, 862 A.2d 331 (2004) ("[c]laims of error by an appellant must be raised in his original brief . . . so that the issue as framed by him can be fully responded to by the appellee in its brief" [internal quotation marks omitted]), cert. denied, 273 Conn. 924, 871 A.2d 1032 (2005). Indeed, the state devoted approximately ten pages of its twenty-four page brief to these claims, reframing them for the Appellate Court in a more logical manner. An appellant cannot, however, rely on the appellee to decipher the issues and explain them to the Appellate Court. "Writing a compelling legal argument is a painstaking, time-consuming task. Good legal analysis is premised on knowing the controlling rules of law. An effective appellate advocate must apply the rules of law to the facts at hand by applying or distinguishing existing legal precedent. . . . To write a good brief and to comply with the rules of practice, counsel must state the rules of law, [and] provide citations to legal authority that support the claims made . . . ." *Mullen & Mahon, Inc.* v. *Mobilmed Support Services, LLC*, supra, 62 Conn. App. 10–11 n.6. We decline to relieve the defendant of her burden to brief her claims adequately based solely on the state's response to those claims in the present case. We, therefore, conclude that the Appellate Court did not abuse its discretion in declining to review the defendant's constitutional claims on the ground that they were inadequately briefed.

The judgment of the Appellate Court is reversed only with respect to the charge of breach of the peace in the second degree and the case is remanded to that court with direction to affirm the judgment of the trial court as to that offense; the judgment of the Appellate Court is affirmed in all other respects.

In this opinion the other justices concurred.

[1] Consistent with the opinion of the Appellate Court, we decline to identify certain individuals in the present case in order to protect the privacy interests of minor children. *State* v. *Buhl*, supra, 152 Conn. App. 142 n.2.

[2] "Facebook is a social networking website that allows private individuals to upload photographs and enter personal information and commentary on a password protected 'profile.' " *State* v. *Eleck*, 130 Conn. App. 632, 634 n.1, 23 A.3d 818 (2011), aff'd, 314 Conn. 123, 100 A.3d 817 (2014). To create a Facebook profile, a person chooses a name under which the profile will be listed, enters his or her birth date and e-mail address, and selects a password. *Smith* v. *State*, 136 So. 3d 424, 432 (Miss. 2014). Thereafter, the profile may be accessed on any computer or mobile device by logging into Facebook's website using the same e-mail address and password combination. See id.

Users post content to their profiles, which may include "written comments, photographs, digital images, videos, and content from other websites. To create a . . . post, users upload data from their computers or mobile devices directly to the Facebook website." *Ehling* v. *Monmouth-Ocean Hospital Service Corp.*, 961 F. Supp. 2d 659, 662 (D.N.J. 2013). Users also

create networks of Facebook "friends" by sending and accepting friend requests. *State* v. *Eleck*, supra, 130 Conn. App. 634 n.1.

"By default, Facebook pages are public. However, Facebook has customizable privacy settings that allow users to restrict access to their Facebook content. Access can be limited to the user's Facebook friends, to particular groups or individuals, or to just the user." *Ehling* v. *Monmouth-Ocean Hospital Service Corp.*, supra, 961 F. Supp. 2d 662. Subject to these privacy settings, a user's "friends" can see certain aspects of the user's profile, including the user's list of friends, and can write comments that appear on the profile. *State* v. *Eleck*, supra, 130 Conn. App. 634 n.1.

[3] "JAP" is a derogatory term meaning "Jewish American Princess." *Bernstein* v. *Sephora*, 182 F. Supp. 2d 1214, 1218 (S.D. Fla. 2002).

[4] When M checked her nightstand, she found that the original diary entries remained there.

[5] Although § 53a-183 was amended in 2012; see Public Acts 2012, No. 12-114, § 13; that amendment has no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

[6] The trial court did not specify on which basis it found the defendant guilty of harassment.

[7] The defendant also argued that there was insufficient evidence to support her harassment conviction based on the Facebook posts because, as with her breach of the peace conviction, the state had not proven her identity as the Facebook poster or her intent to "harass, annoy or alarm" M by posting her diary entries on Facebook. General Statutes § 53a-183 (a) (2). The Appellate Court did not address these contentions, instead affirming the defendant's harassment conviction on the basis of the anonymous mailing alone. *State* v. *Buhl*, supra, 152 Conn. App. 152–54. We agree with the Appellate Court that sufficient evidence supports the defendant's harassment conviction based on the anonymous mailing on that ground. We therefore, similarly, do not address whether the state proved its alternative theory of harassment vis-à-vis the Facebook posts.

[8] Because we conclude that there was sufficient evidence to support the trial court's finding that the Facebook posts were publicly exhibited, we address these remaining elements in the interests of judicial economy, rather than remanding them to the Appellate Court for initial consideration. See, e.g., *State* v. *James*, 261 Conn. 395, 411, 802 A.2d 820 (2002). The defendant does not appear to dispute the fact that the Facebook posts contain "offensive, indecent or abusive matter . . . ." General Statutes § 53a-181 (a) (4).

[9] General Statutes § 53a-181 (a) provides in relevant part: "A person is guilty of breach of the peace in the second degree when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person . . . (4) publicly exhibits, distributes, posts up or advertises any offensive, indecent or abusive matter concerning any person . . . ."

[10] The Appellate Court reasoned that the Facebook posts had to be exhibited in a "public place," defined in § 53a-181 (a) as an area "used or held out for use by the public," in order to be publicly exhibited. (Emphasis omitted.) *State* v. *Buhl*, supra, 152 Conn. App. 158. Applying this definition, the Appellate Court concluded that to be publicly exhibited, the Facebook posts had to be accessible by the general public, and not only to "Tasha Moore's" friends. See id., 158. Because we conclude that the trial court reasonably could have concluded that the posts *were* accessible to the general public on the facts of the present case, we need not decide whether a Facebook post that is accessible only to a user's network of friends is publicly exhibited for the purposes of § 53a-181 (a). We leave that question for another day.

[11] The Appellate Court determined that the state needed to present testimony "from a person with suitable knowledge, experience or other relevant qualification relating to the operation of Facebook's privacy settings," but noted that "[s]uch testimony need not necessarily be in the form of expert testimony." *State* v. *Buhl*, supra, 152 Conn. App. 160 and n.9. It is unclear what additional knowledge or experience the Appellate Court considered necessary to establish the public nature of the posts, beyond M's testimony as a Facebook user, short of expert testimony. We, therefore, consider whether expert testimony was required to prove the public element of the crime.

[12] We do not suggest that *all* matters related to Facebook or other social media are within the realm of the "ordinary knowledge and experience" of the trier of fact or that *all* such concepts are not "sufficiently [complex]" to require further explanation from an expert. *State* v. *Smith*, supra, 273 Conn. 211; *Johnson* v. *Commissioner of Correction*, supra, 34 Conn. App.

158. We simply hold that expert testimony was not required in the present case, beyond M's testimony as a Facebook user, to establish that the posts were publicly exhibited.

[13] In holding that expert testimony was required on the public nature of the posts, the Appellate Court relied on our "cautionary language" in *State* v. *Altajir*, 303 Conn. 304, 33 A.3d 193 (2012), with regard to Facebook. *State* v. *Buhl*, supra, 152 Conn. App. 160. In *Altajir*, this court stated that Facebook's "general infrastructure, including [its] privacy settings, is highly dynamic and in many cases may be accurately assessed only with reference to a limited time period." *State* v. *Altajir*, supra, 310 n.2. This court also stated that, "[d]ue to the dynamic nature of Facebook and other such social network sites, these details, as well as basic structural features of the social network, are subject to frequent modification. Care should therefore be taken to assess information relating to social network sites on a case-by-case basis, with due attention to the nature of the site at the time relevant to the case." Id., 307 n.1. The Appellate Court reasoned that this language "underscore[d]" the need for expert testimony or other evidence establishing "the operation of Facebook's privacy settings" and the public nature of the posts. *State* v. *Buhl*, supra, 160.

Our concerns in *Altajir*, however, are inapposite to the present case. *Altajir* concerned the admission of Facebook photographs at a probation revocation hearing as direct evidence of a probationer's behavior after her incarceration. *State* v. *Altajir*, supra, 303 Conn. 306. Thus, the probationer's Facebook activity was only relevant with respect to a particular time period, namely, that of her probation. Id., 308–309. The state, however, "presented no evidence regarding how [the] photographs had been acquired, who could view the [probationer's] Facebook profile or how Facebook's features governing publicity and privacy functioned during the relevant time period." Id., 310; see also id., 320 n.7. Although we concluded that the photographs had the "minimal indicia of reliability" for admission at the hearing, we expressed concerns with admitting Facebook evidence with generalized testimony on the workings of Facebook, without tying such testimony to the relevant time period, due to the "dynamic nature" of Facebook and "frequent modification[s]" to its features and privacy settings. Id., 307 n.1, 322. The present case, by contrast, is not dependent on the reliability of Facebook evidence to establish that an act occurred during any particular time period. M's testimony that she could view the posts without being friends with "Tasha Moore" at any point in time is sufficient to establish the public element of the crime under § 53a-181 (a) (4).

[14] We assume, without deciding, that the Appellate Court could consider the trial court's statement in evaluating the defendant's sufficiency of the evidence claims.

[15] The trial court confirmed, for example, that an exhibit showed a Facebook profile, asked M about the concept of "tagg[ing]" someone in a photograph on Facebook, and clarified M's testimony with respect to Facebook's privacy settings.

[16] Additionally, the language used by trial court in inquiring as to the relevant Facebook concepts evinced its understanding of those concepts. The trial court eventually used the verb "friend[ing]" freely and engaged in dialogue about Facebook's privacy settings.

[17] For example, the trial court inquired of M as follows:

"The Court: . . . [Y]ou were asked some questions about how Facebook works . . . . And *I want to make sure I understand it.* . . . [Is there] a way to tell what someone's Facebook . . . privacy [settings are]?

"[M]: Yes . . . . It seemed to be public because I could see it from my own [account] and I was not friends with her. . . . And I could see the same content from my friend's [account] who was friends with her." (Emphasis added.)

M testified similarly on cross-examination:

"Q. . . . Earlier, did you say that you went through [a friend's] account to view what was posted?

"A. Originally . . . . And then through my own.

"Q. And that's your testimony. You went originally through his?

"A. I could see the exact same content through his Facebook that I could see through my own and I was not friends with [Tasha Moore]."

[18] Moreover, beyond M's testimony, other evidence in the record demonstrated the public nature of the Facebook posts. The printed copy of the Facebook profile, admitted into evidence, shows an "Add as Friend" button at the top of the profile. This button indicates, circumstantially, that the person viewing the profile is not already friends with "Tasha Moore." Further

down on the page, the posts about M are visible. Thus, it appears that someone who is not already friends with "Tasha Moore" could view the profile and the posts about M in their entirety.

[19] We note that Sergeant Ogrinc testified to the following facts at trial: (1) that she contacted Facebook seeking "information on . . . the IP address used for Tasha Moore"; (2) that she ascertained an IP address; and (3) that information she subsequently received from Cablevision indicated that the IP address she had been investigating belonged to the defendant. The state then asked Sergeant Ogrinc whether "the IP address used by Tasha Moore [was] the same IP addressed assigned to [the defendant] by Cablevision." The defendant objected, asserting that the question elicited inadmissible hearsay, and the state withdrew the question. In the course of ruling on the defendant's posttrial motions, the court stated that "[t]here was no evidence that directly linked [the defendant to] the initial Facebook page" and that, although "[t]here was some testimony about the investigation and [going] from step one to step two," the court "did not rely on what the state might have been trying to suggest . . . ."

[20] " 'Alarm' is defined as 'to strike with fear: fill with anxiety as to threatening danger or harm . . . .' Webster's Third New International Dictionary [1993]." *State* v. *Cummings*, 46 Conn. App. 661, 673, 701 A.2d 663, cert. denied, 243 Conn. 940, 702 A.2d 645 (1997).

[21] Defense counsel essentially conceded at trial that the Facebook posts could reasonably show an intent to cause inconvenience, annoyance, or alarm M.

[22] Moreover, "it is a permissible, albeit not a necessary or mandatory, inference that a defendant intended the natural consequences of his [or her] voluntary conduct." (Internal quotation marks omitted.) *State* v. *Anderson*, 74 Conn. App. 633, 638, 813 A.2d 1039, cert. denied, 263 Conn. 901, 819 A.2d 837 (2003). The trial court could have relied on M's testimony that she did, in fact, feel annoyed and alarmed by the Facebook posts. She testified that she was "too upset" to go out that night and celebrate her graduation with her friends. She was "really upset" by the post, "fearful" and "afraid" that more people would see it, and "paranoid" about the fact that someone had gone through her belongings. P testified that although M was a "strong-willed person," she was "very upset" by the posts and felt "violated and embarrassed in public." Officer Gulino testified that M was "visibly distraught" and "crying intermittently" at the police station, and that her hands shook as she used her cell phone.

[23] The defendant also argues that the state had to prove beyond a reasonable doubt that the Facebook posts were intended or likely to produce imminent disorder, namely, that it contained "fighting words." See *Cantwell* v. *Connecticut*, 310 U.S. 296, 308, 60 S. Ct. 900, 84 L. Ed. 1213 (1940) ("The offense known as breach of the peace embraces a great variety of conduct destroying or menacing public order and tranquility. It includes not only violent acts but acts and words likely to produce violence in others."); *State* v. *Indrisano*, 228 Conn. 795, 811–12, 640 A.2d 986 (1994) (noting principle announced in *Chaplinsky* v. *New Hampshire*, 315 U.S. 568, 573, 62 S. Ct. 766, 86 L. Ed. 1031 [1942], that " 'fighting words' limitation" must be applied when conduct consists "purely of speech"). "Fighting words consist of speech that has a direct tendency to cause imminent acts of violence or an immediate breach of the peace. Such speech must be of such a nature that it is likely to provoke the average person to retaliation." (Internal quotation marks omitted.) *State* v. *Gaymon*, 96 Conn. App. 244, 248, 899 A.2d 715, cert. denied, 280 Conn. 906, 907 A.2d 92 (2006).

Connecticut cases holding that the state must prove that the speech constitutes "fighting words" have, however, concerned other subdivisions of § 53a-181 (a) or predated *State* v. *Wolff*, supra, 237 Conn. 670, in which this court clarified the mental state element of the crime. See, e.g., *State* v. *Weber*, 6 Conn. App. 407, 414–15, 505 A.2d 1266 (upholding conviction under § 53a-181 [a] [5] because language was abusive and constituted fighting words), cert. denied, 199 Conn. 810, 508 A.2d 771 (1986); *State* v. *Beckenbach*, 1 Conn. App. 669, 678, 476 A.2d 591 (1984) ("both sides agree, as do we, that the constitutional guarantee of freedom of speech requires that [the provision prohibiting abusive speech set forth in § 53a-181 (a) (5)] be confined to language which, under the circumstances of its utterance, constitutes 'fighting words'—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace"), rev'd on other grounds, 198 Conn. 43, 501 A.2d 752 (1985); *State* v. *Hoskins*, 35 Conn. Supp. 587, 589, 594, 401 A.2d 619 (1978) (reversing conviction under § 53a-181 [4] when defendant painted message on wall of church stating that " 'Jews murdered

Jesus Christ' " because speech did not constitute fighting words).

After *Wolff*, the state need only prove that the defendant had the "predominant intent . . . to cause what a reasonable person operating under contemporary community standards would consider a disturbance to or impediment of a lawful activity, a deep feeling of vexation or provocation, or a feeling of anxiety prompted by threatened danger or harm" to satisfy the mental state element of breach of the peace. *State* v. *Wolff*, supra, 237 Conn. 670; see, e.g., *State* v. *Labbe*, 61 Conn. App. 490, 491–96, 767 A.2d 124 (upholding motorist's conviction under § 53a-181 [a] [5] when he exposed himself to another motorist in parking lot of rest stop with no discussion of whether act was intended or likely to produce imminent disorder), cert. denied, 256 Conn. 914, 773 A.2d 945 (2001).

[24] According to the defendant, because M was not "invited" to view the Facebook posts through a friend request, the posts are more akin to venting or gossiping in the public domain. The defendant, however, could have "vented" these thoughts in a more private manner. See, e.g., *State* v. *Eleck*, 130 Conn. App. 632, 634 n.1, 23 A.3d 818 (2011), aff'd, 314 Conn. 123, 100 A.3d 817 (2014) (Facebook users can send "a private message to any other Facebook user in a manner similar to [e-mail]"). She instead chose to thrust M's private diary entries, along with her own offensive remarks, into the public sphere, which evinces an intent to annoy or alarm M. See *O'Leary* v. *State*, 109 So. 3d 874, 877 (Fla. App. 2013) ("[g]iven the mission of Facebook, there is no logical reason to post comments other than to communicate them to other Facebook users").

[25] It is unclear whether M saw the mailing, but the defendant did not need to communicate with M directly to have an intent to annoy or alarm her. See *State* v. *Snyder*, supra, 40 Conn. App. 552.

[26] The defendant also argues that the mailing does not evince an attempt to harass, annoy or alarm P or M because P and M already knew of the contents of the mailing as a result of the Facebook posts. Just because P and M reasonably felt annoyed or alarmed by the Facebook posts does not, however, mean that they could not reasonably feel annoyed or alarmed by the same content *again* upon receipt of the mailing. It is also not clear whether P, himself, saw the Facebook posts or read M's diary entries before receiving the mailing. P learned of the Facebook posts when M called him after bringing copies to the police station on June 24, 2010.

[27] The defendant relied on *State* v. *Murphy*, 254 Conn. 561, 574, 757 A.2d 1125 (2000), and *State* v. *Moulton*, 120 Conn. App. 330, 352, 991 A.2d 728 (2010), which hold that the crime of harassment in the second degree must be predicated on the defendant's conduct, and not the content of his or her communications, in order to comport with the first amendment. This court, however, has since overruled its decision in *Murphy* and reversed the Appellate Court's decision in *Moulton*, concluding that § 53a-183 (a) (2) proscribes harassing and alarming speech as well as conduct. See *State* v. *Moulton*, 310 Conn. 337, 362, 78 A.3d 55 (2013).

[28] The trial court did not credit the defendant's theory, put forth through P's testimony, that her efforts as an investigative journalist led to her involvement in these events. The trial court stated: "I did not find credible the kind of second hand statements through [P], as to this being somehow involved in investigative reporting."

[29] This court has also stated that deciding whether to review an inadequately briefed claim constitutes an exercise of judicial discretion. See, e.g., *Commissioner of Environmental Protection* v. *Farricielli*, 307 Conn. 787, 816 n.22, 59 A.3d 789 (2013) ("we exercise our discretion to review these [allegedly inadequately briefed] claims"); *Northeast Ct. Economic Alliance, Inc.* v. *ATC Partnership*, 272 Conn. 14, 51 n.23, 861 A.2d 473 (2004) ("we exercise our discretion to decline to review this claim as inadequately briefed"); *Ward* v. *Greene*, 267 Conn. 539, 546, 839 A.2d 1259 (2004) (addressing inadequately briefed claim "[i]n the exercise of our discretion").

[30] Indeed, the defendant conceded at oral argument before this court that an abuse of discretion standard would be appropriate. The defendant claims in her brief, however, that this court has an independent duty to examine the record for first amendment violations, citing *DiMartino* v. *Richens*, 263 Conn. 639, 661–63, 822 A.2d 205 (2003). This court stated in *DiMartino* that, "in cases raising [f]irst [a]mendment issues [the United States Supreme Court has] repeatedly held that an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." (Internal quotation marks omitted.) Id., 662; see *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 284–86, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964); see also *Brown* v. *K.N.D. Corp.*, 205 Conn. 8, 13–14, 529 A.2d 1292

(1987) ("The purpose of independent review is to safeguard the right of free expression. . . . The function of the procedural scheme created by [the United States Supreme Court in a long line of first amendment cases] is obviously to require an independent second opinion when free speech is curtailed. These cases place the ultimate constitutional responsibility on appellate courts to render that second opinion in order to safeguard free expression." [Citations omitted.]). *DiMartino* suggests, however, that once a claim under the first amendment is *properly raised and briefed*, appellate courts need not defer to the trial court's findings of fact and should examine the record de novo. See *DiMartino* v. *Richens*, supra, 661–63. Here, the issue is whether the claim was adequately briefed, and *DiMartino* has no bearing on that analysis.

[31] These are generous estimates, which require piecing together the defendant's various assertions throughout her brief.

[32] We acknowledge that some claims may logically be combined under one heading. See, e.g., *Shenkman-Tyler* v. *Central Mutual Ins. Co.*, 126 Conn. App. 733, 740 n.3, 12 A.3d 613 (2011) ("Although the [appellant] does not separate his argument as it applies to each action but, rather, discusses them jointly insofar as the issues overlap, we do not agree with [the appellee's] assertion that the [appellant] has abandoned his claims . . . . [T]he [appellant]'s brief contains five pages of analysis and citation to relevant case law relating to his claim . . . . In light of the fact that the issue . . . presents a question of law, this level of briefing is adequate for review of his claim." [Citation omitted.]). The constitutional and sufficiency of the evidence claims in the present case, however, do not represent such conceptually related claims.

[33] The defendant's first two headings concern her harassment conviction and her breach of the peace conviction, respectively. Her last two headings claim that the trial court improperly denied her postverdict motions, but assert essentially the same claims.