******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STEPHANIE O'SHEA *v.* JACK SCHERBAN ET AL.
## (SC 20542)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Kahn, Ecker and Keller, Js.

*Syllabus*

The plaintiff, who had run in the November, 2020 election to fill a vacant
position on the Board of Education of the City of Stamford, appealed
to the trial court, seeking to compel the defendants, including various
city election officials, to seat her as a member of the board after she
received the most votes for the position and the city determined that
the vacant position had been included on the election ballot in error
and declined to credit the election result. Pursuant to the applicable
provisions (§ C1-80-2 (b) and (c)) of the Stamford charter, the city's
Board of Representatives appointed the defendant H in February, 2020,
to fill the vacancy until the next biennial election in November, 2021.
In October, 2020, after ballots for the November, 2020 election were
printed and sent to absentee voters, and the plaintiff and other individu-
als had registered as write-in candidates, the city discovered that the
vacant board position had been placed on the ballot in error. City officials
then met with the plaintiff and the other candidates to discuss the city's
determination that, under § C1-80-2, biennial elections are held in odd
numbered years rather than in even numbered years and that H had
been appointed to fill the vacant position until the next biennial election.
The city further determined that it would be confusing to voters to print
and distribute corrected ballots, given the short period of time before
the election, and, thus, the election for the vacant position proceeded.
The trial court rendered judgment for the defendants, concluding that
the city charter unambiguously provided that H's appointment by the
Board of Representatives placed her in the vacant position until the
next biennial election in 2021. On appeal, the plaintiff claimed that the
city was required to hold an election in November, 2020, to fill the
vacancy on the board for the balance of the vacated term. She asserted,
inter alia, that the term "biennial election" in § C1-80-2 should be con-
strued to mean "the next town election" and that to construe "biennial
election" to mean elections held in odd numbered years would violate
various provisions of the federal and state constitutions. *Held*:

1. The plaintiff's claim that the term "biennial election" in § C1-80-2 should
be construed to mean "the next town election" was unavailing, as that
term refers to elections for vacant positions occurring every other year,
which, in Stamford, are the odd numbered years: although the city
charter did not define "biennial" and § C1-80-2 (c) did not specify
whether the term "next biennial election" means even numbered years
or odd numbered years, it was clear from looking at a related provision
(§ C1-70-1) of the charter, which required elections to occur biennially
beginning in 1953, that biennial elections were to occur in odd numbered
years, and that conclusion was supported by the statutory (§ 9-164 (a))
requirement that municipal elections are to be held biennially; moreover,
the requirement of the city charter's savings provision (§ C1-40-2) that
the charter be construed in harmony with state statutory law did not
compel the conclusion that the vacant board position was required to be
filled at the next city election, as the relevant statute (§ 9-220) requiring
vacancies to be filled at the next town election or at a special election
allowed for other arrangements "as otherwise provided by law," and
§ C1-80-2 clearly provided otherwise; furthermore, contrary to the plain-
tiff's claim, a city charter provision that required a different schedule
for vacancy elections than for regular elections would not yield absurd
or unworkable results, and the doctrine of constitutional avoidance
was inapplicable, as the charter was not genuinely susceptible to two
constructions, and its plain meaning did not raise serious constitu-
tional questions.

2. The plaintiff could not prevail on her claims that the first amendment to
the United States constitution required the city to hold an election for
the vacant board position at the next regularly scheduled city election,

that is, in November, 2020, and that the city's failure to count and validate the votes for the position in the 2020 election unconstitutionally disenfranchised her: the plaintiff failed to clearly articulate a specific constitutional claim, and, insofar as she claimed that the city charter's vacancy election provision, which required skipping the city's next regularly scheduled election at which a full-term board position would be on the ballot, was unconstitutional, it was well established that municipalities have vast leeway in the management of their internal affairs, including the flexibility to decide whether members of boards of education are elected or appointed; moreover, the federal constitution permits some delay in the holding of vacancy elections, and the plaintiff presented no authority to support her assertion that delaying the holding of a vacancy election until the next biennial election was unconstitutional; furthermore, the plaintiff's claim that she would be unconstitutionally disenfranchised unless the votes were counted and the result honored was unavailing, as the plain language of the charter made clear that no valid election could have been held, and this court was aware of no authority that constitutional principles required this court to validate a void election.

3. The plaintiff did not demonstrate that the state constitution required vacant board positions to be filled by an election, as opposed to appointment, as soon as possible, as the plaintiff advanced no authority and engaged in no analysis suggesting that the constitutional text or Connecticut or federal precedent supported her claim, and the state constitution contains no provision pertaining to the vacancy at issue.

4. There was no merit to the plaintiff's claim that the doctrine of municipal estoppel required the defendants to count the votes that were cast for the vacant board position: the plaintiff could not show that she would be subjected to a substantial loss if the votes were not counted because, under the city charter, there was no election in which she could run and, thus, no seat to lose; moreover, the plaintiff could not show that she lacked or had no convenient means of acquiring knowledge of the true state of things, as she could have avoided any harm that resulted from her misapprehension of the city charter by reading it or asking the city for clarification before registering as a write-in candidate, and the plaintiff had actual knowledge of the true state of affairs in October, 2020, when city officials met with her and other candidates after discovering that the vacant board position had been placed on the ballot in error.

Argued January 21—officially released July 26, 2021*

*Procedural History*

Action seeking a writ of mandamus compelling the defendants to seat the plaintiff as a member of the Board of Education of the City of Stamford, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk, where the court, *Genuario, J.*, granted the motion filed by Joshua A. Esses to intervene; thereafter, the case was tried to the court; judgment for the defendants, from which the plaintiff appealed. *Affirmed.*

*Brenden P. Leydon*, for the appellant (plaintiff).

*Aaron S. Bayer*, with whom was *Jenny R. Chou*, for the appellees (named defendant et al.).

*Proloy K. Das*, with whom was *Kevin W. Munn*, for the appellee (defendant Rebecca Hamman).

*Maura Murphy Osborne*, assistant attorney general, for the appellee (defendant Denise Merrill).

*Joshua A. Esses*, self-represented, the appellee (intervenor).

*Opinion*

D'AURIA, J. In this appeal, we must construe a Stamford Charter (charter) provision that controls the filling of vacancies on the Board of Education of the City of Stamford (board) and consider claims that, as applied to the circumstances of this case, both the provision generally and the actions of election officials specifically violate the federal and state constitutions. The plaintiff, Stephanie O'Shea, wanted to run in the November, 2020 election to fill a vacancy on the board and claims that she in fact ran in that election, won it and should be serving on the board presently. She brought suit when the city's election officials refused to credit the election results on the ground that the charter provides that the election to fill the vacancy could not be held until the "next biennial election" in 2021. Stamford Charter § C1-80-2 (b). She appeals from the judgment of the trial court rendered in favor of the defendants, who are various city election officials and the secretary of the state.[1]

The charter contains two provisions that control the filling of vacancies in elective office. In the first instance, § C1-80-2 (b) of the charter provides that, when a vacancy occurs "in any elective office and no specific provision for filling such vacancy is made in this [c]harter, the Board of Representatives shall, within sixty (60) days following the vacancy, elect a successor to fill such vacancy until December first following the next biennial election." Stamford Charter § C1-80-2 (b). Section C1-80-2 (c) provides in relevant part: "When the Board of Representatives has elected a successor to fill a vacancy in the office of Mayor, on the Board of Representatives, on the Board of Finance or on the Board of Education as set forth above in [§] C1-80-2 (b), then and in that event, a vacancy election shall be held at the next biennial election. . . ." Stamford Charter § C1-80-2 (c). On appeal, the plaintiff contends that we should construe the phrase, "next biennial election," to mean "next city election." She also claims that, if next "biennial election" is held to mean elections held in odd numbered years, then § C1-80-2 (c) violates the first amendment to the United States constitution and article first, §§ 1, 2, 4, 5, 8, 14 and 20, as well as article sixth, § 4, of the Connecticut constitution. In addition, the plaintiff argues that the defendants' actions in refusing to count the votes cast for the vacant position in November, 2020, were unconstitutional under the first amendment to the United States constitution. Finally, she claims that the doctrine of municipal estoppel should apply to prevent the defendants from refusing to count the votes.[2] We disagree with the plaintiff and, accordingly, affirm the judgment of the trial court.

The following facts and procedural history, as stipulated by the parties, contained in the record, and found by the trial court, are relevant to this appeal. The charter

provides for nine board members, with three positions up for election each year for three year terms. Stamford Charter § C1-80-5. In November, 2018, voters elected Frank Cerasoli and two other candidates to three year positions on the board. The term for Cerasoli's position ran from December 1, 2018, through November 30, 2021. Cerasoli vacated his position in January, 2020. Pursuant to § C1-80-2 (b) of the charter, in February, 2020, the city's Board of Representatives appointed the defendant Rebecca Hamman to fill the seat Cerasoli vacated, and she has served in that position since then.

By early October, 2020, ballots were printed for the November 3, 2020 election. The ballots included offices for president of the United States, United States representative, state senator, state representative, registrar of voters, three full-term Board of Education positions, and "Board of Education To Fill Vacancy for One Year." The board vacancy position did not have any party endorsed candidates. The ballots were sent to absentee voters.

The plaintiff registered as a write-in candidate for the board vacancy position on October 5, 2020. Hamman and the intervenor, Joshua A. Esses, also registered as write-in candidates. On October 8, 2020, Stamford voter Eric Rota submitted an absentee ballot that included a vote for the plaintiff for the board vacancy position.

After questions were raised in the media regarding whether the ballot should have included the board vacancy position, the town clerk asked the city's corporation counsel, Attorney Kathryn Emmett, for an opinion on whether an election should take place for the position. On October 16, 2020, the mayor, David R. Martin, and Attorney Emmett met with the plaintiff, the party endorsed candidates for the three full-term board positions, and others. During that meeting, Mayor Martin discussed Attorney Emmett's conclusion that, under the charter, there could be no election for the position in 2020 and that the position had been included on the ballot in error. Mayor Martin also discussed the city's view that, because overseas and military ballots had already been printed and mailed, it would be problematic and confusing to voters to print and distribute corrected ballots given the short period of time before the election.

The same day, Attorney Emmett issued a legal opinion concluding that, under § C1-80-2 of the charter, "after the Board of Representatives has elected a successor to fill the vacancy . . . a vacancy election shall be held at the next biennial election" and that "biennial elections are held in odd-numbered years." The opinion concluded by stating that "there is currently no one (1) year term vacancy to fill on the Board of Education because Rebecca Hamman has been elected by the Board of Representatives to fill the partial term seat until the 2021 biennial election."

On October 20, 2020, Attorney Emmett participated in a conference call with Director of Elections Theodore Bromley and Staff Attorney Aida Carini, both from the Office of the Secretary of the State (secretary). Bromley and Attorney Carini informed Attorney Emmett that the secretary would not require the city to reprint the ballots and that the secretary would not take a position on whether there was a valid election for the board vacancy position because that was a question of municipal law. Bromley and Attorney Carini also indicated that, given Attorney Emmett's conclusion that there was no valid election for the position, the secretary expected that the city would report no election results for that position.

On October 21, 2020, Mayor Martin and Attorney Emmett met again with the plaintiff, party endorsed candidates for the three year positions on the board, and others. At this meeting, Mayor Martin informed the participants that the ballots would not be reprinted and related that the secretary expected that the city would report no election results for the board vacancy position.

On November 5, 2020, the following numbers of votes for the board vacancy position were reported in the secretary's election management system: Esses, 2; Hamman, 21; and O'Shea, 578.[3] Nonetheless, on November 9, 2020, the city's head moderator, defendant Jack Scherban, submitted a final report and certification of votes to the secretary that did not include any votes for the position.

The plaintiff brought this action pursuant to General Statutes § 9-328, claiming that the charter, either by its terms or by a construction consistent with various federal and state constitutional provisions, required the city to hold an election in November, 2020, to fill the vacancy for the balance of the vacated term. The defendants contended to the contrary that the charter unambiguously provides that Hamman's appointment by the Board of Representatives filled the vacated position until November 30, 2021. The trial court held that the charter provisions clearly and unambiguously provided that Hamman's appointment by the Board of Representatives placed her in the vacancy position until November 30, 2021.

The trial court rendered judgment in favor of the defendants, and the plaintiff appealed to the Appellate Court. We then transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. Following oral argument, we issued a ruling from the bench on January 21, 2021, affirming the trial court's judgment. We indicated at that time that a full opinion would follow. This is that opinion.

I

The plaintiff first claims that we should construe the

term "biennial election" in § C1-80-2 of the charter to mean "the next town election." We disagree. The term "biennial election" unambiguously refers to elections occurring every other year, which, in Stamford, are the odd numbered years.

The plaintiff does not argue that the term "biennial election" is ambiguous. Rather, she contends that, at the time the charter was written, the phrases "biennial election" and "the next town election" were interchangeable because the city held no elections in the intervening years. This fact, she argues, demonstrates original legislative intent, and we, therefore, should construe the charter consistent with this intent. The plaintiff further argues that interpreting "biennial election" to mean "the next town election" is necessary to harmonize the charter with General Statutes § 9-220.[4] Finally, the plaintiff argues that such a construction is necessary to avoid first amendment and fourteenth amendment due process concerns. We address each of these claims in turn, applying General Statutes § 1-2z and our familiar principles of statutory construction to the charter provisions. See *Russo* v. *Waterbury*, 304 Conn. 710, 720, 41 A.3d 1033 (2012). We also apply the same plenary standard of review to the trial court's interpretation of the charter as we would to a court's construction of a statute. See *Cook-Littman* v. *Board of Selectmen*, 328 Conn. 758, 767–68, 184 A.3d 253 (2018).

We first consider the text of the statute itself and its relationship to other statutes. See id. The Board of Representatives' appointment of Hamman in February, 2020, to fill the seat vacated by Cerasoli implicated § C1-80-2 (c) of the charter, which provides in relevant part: "When the Board of Representatives has elected a successor to fill a vacancy . . . on the Board of Education as set forth . . . in [§] C1-80-2 (b), then and in that event, *a vacancy election shall be held at the next biennial election.* . . ." (Emphasis added.) The charter does not define the word "biennial." General Statutes § 1-1 (a) directs us to construe words that are not statutorily defined according to their commonly approved usage. *State* v. *Menditto*, 315 Conn. 861, 866, 110 A.3d 410 (2015). Dictionaries in print at the time of a provision's enactment are most instructive. Id. Webster's defines "biennial" as "[h]appening, or taking place, once in two years." Webster's New International Dictionary (2d Ed. 1953) p. 265; see also Black's Law Dictionary (4th Ed. 1968) p. 206 (defining "biennially" as "once in every two years").

Because § C1-80-2 (c) does not specify whether the charter's use of the phrase "next biennial election" means even numbered or odd numbered years, we look to related charter provisions for guidance. See *Studer* v. *Studer*, 320 Conn. 483, 489, 131 A.3d 240 (2016) (related statutory provisions often provide guidance in determining meaning of particular word). Section C1-70-1 of

the charter provides in relevant part that, "[e]xcept as hereinafter provided, on the Tuesday after the first Monday in November, *1953 and biennially thereafter*, there shall be held in Stamford an election to elect officers. . . ."[5] (Emphasis added.) Because the first biennial election in Stamford was held in 1953, an odd numbered year, it is clear that successive biennial elections would also occur in odd numbered years.

Although the text of the charter itself is sufficient to establish that biennial elections in the city are held every other year in odd numbered years, this conclusion is further supported by General Statutes § 9-164 (a), which provides in relevant part: "Notwithstanding any contrary provision of law, there shall be held in each municipality, biennially, a municipal election . . . [in] the odd-numbered years . . . ." See *Fay* v. *Merrill*, 336 Conn. 432, 446, 246 A.3d 970 (2020) (§ 1-2z instructs us to consider text of statute and its relationship to other statutes). Although § 9-164 does not require municipalities to hold municipal elections biennially in odd numbered years, that is the legislature's default arrangement, and the charter contains no contrary provision but instead contains a provision that is consistent with § 9-164. Therefore, in the present case, the vacancy election for the board position would properly be held in November, 2021—not in November, 2020, as the plaintiff argues and the city originally planned.

The plaintiff is correct that, at the time of the adoption of § C1-70-1, city elections were held only biennially, in odd numbered years. In 1969, the city moved to annual elections for board positions, with three of the nine board members elected each year to staggered three year terms. See 34 Spec. Acts 74, No. 96 (1969). Therefore, the city now also holds elections in the intervening even numbered years for full-term board positions. The plaintiff argues that this fact demonstrates an intent that, as used in the charter, "biennial" means "the next town election." As our analysis makes clear, however, § C1-80-2, read together with § C1-70-1, unambiguously provides that elections for vacant positions on the board are held at the next biennial election, which is held only in odd numbered years. Because the charter is clear on this point, we do not consider circumstances surrounding the provision's enactment. See, e.g., *State* v. *Rupar*, 293 Conn. 489, 510–11, 978 A.2d 502 (2009).

Nevertheless, the plaintiff argues that the charter's savings provision, § C1-40-2,[6] when read together with § 9-220,[7] compels the opposite conclusion. Specifically, she contends that, because § 9-220 provides that the city "shall, except as otherwise provided by law, fill the vacancy [in elective office] at the next town election or at a special election called for such purpose," and because the savings provision requires the city to construe state statutes in harmony with the charter provi-

sions, the city must fill the vacant board position at the next town election, not at the next biennial election. This argument ignores the phrase, "except as otherwise provided by law," in § 9-220. Section C1-80-2 clearly provides otherwise; that is, vacancy positions for the board are to be held at the next biennial election. There is no conflict between the charter and § 9-220.

The plaintiff argues, however, that, even if § C1-80-2 is plain and unambiguous, its plain meaning leads to an absurd result. She makes much of the fact that board members are the only officers elected to staggered three year terms[8] and that, in the absence of a vacancy, board elections are held annually with three board positions up for election each year.[9] Because the city already holds elections for the board each year, the plaintiff argues, it is "absurd and unworkable" to limit vacancy elections to the board to biennial election years. We disagree. Vacancy elections differ from regular elections, in part because, on average, vacancies occur less frequently, and it is not always possible to predict when a vacancy will occur. A charter provision that responds to these considerations by requiring a different schedule for vacancy elections than for regular elections does not yield absurd or unworkable results.

Finally, the plaintiff argues that the city's interpretation of the charter raises first and fourteenth amendment due process issues and that the doctrine of constitutional avoidance therefore requires us to interpret "biennial election" as meaning "the next town election." Under the doctrine of constitutional avoidance, "[a] statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional, but also grave doubts upon that score." *United States* v. *Jin Fuey Moy*, 241 U.S. 394, 401, 36 S. Ct. 658, 60 L. Ed. 1061 (1916). The United States Supreme Court has held, however, that, to apply this doctrine, "the statute must be *genuinely* susceptible to two constructions after, and not before, its complexities are unraveled." (Emphasis added.) *Almendarez-Torres* v. *United States*, 523 U.S. 224, 238, 118 S. Ct. 1219, 140 L. Ed. 2d 350 (1998). This court has similarly held that it will apply the doctrine of constitutional avoidance "[i]f literal construction of a statute raises *serious* constitutional questions . . . ." (Emphasis added.) *Sassone* v. *Lepore*, 226 Conn. 773, 785, 629 A.2d 357 (1993). As we discuss in parts II and III of this opinion, the plaintiff has not clearly articulated why the charter's plain meaning raises a risk of serious constitutional infirmity. Therefore, because we do not find the charter genuinely susceptible to two constructions, or that its plain meaning raises serious constitutional questions, we find the doctrine of constitutional avoidance inapplicable.

## II

The plaintiff next claims that a charter provision limiting vacancy elections to odd numbered years violates

the first amendment to the United States constitution, as applied to the states through the due process clause of the fourteenth amendment.[10] The plaintiff also claims that the city's failure to validate the votes cast in November, 2020, disenfranchises her. We address these claims in turn.

The constitutionality of a charter provision, as with statutes, presents a question of law over which our review is plenary. A validly enacted statute or charter provision carries with it a strong presumption of constitutionality, and we will indulge every presumption in favor of its constitutionality and sustain it unless its invalidity is clear. The plaintiff thus must sustain the heavy burden of proving the statute's unconstitutionality beyond a reasonable doubt. See, e.g., *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, 317 Conn. 357, 405, 119 A.3d 462 (2015).

A

To the extent the plaintiff challenges the constitutionality of the charter provision on its face, she has not clearly articulated a specific constitutional claim or provided sufficient analysis or relevant authority to support her claim.[11] Insofar as the plaintiff argues that it is unconstitutional for the charter's vacancy election provision to require skipping the city's next regularly scheduled election at which a full-term board position would be on the ballot, it is well established that a municipal government has "vast leeway in the management of its internal affairs." *Sailors* v. *Board of Education*, 387 U.S. 105, 109, 87 S. Ct. 1549, 18 L. Ed. 2d 650 (1967). This leeway generally includes the ability to decide whether local officers are appointed or elected.[12] Id., 111. Therefore, it is not surprising to find that Connecticut law provides municipalities the flexibility to decide whether members of local boards of education are elected or appointed.[13] See General Statutes § 9-185 ("*Unless otherwise provided by special act or charter* . . . members of boards of education . . . shall be elected" (emphasis added)); see also *Cheshire* v. *McKenney*, 182 Conn. 253, 259, 438 A.2d 88 (1980) (local boards of education "are either elected by local constituencies; General Statutes § 9-203; or, pursuant to the town charter, are appointed by an elected officer or body of the municipality"). New Haven is an example of a municipality that has taken advantage of this flexibility. See New Haven Charter, tit. I, art. VII, § 3 (A) (2) ("the Board of Education shall consist of seven (7) members as follows: the Mayor, four (4) members appointed by the Mayor, subject to approval by the Board of Alders; and two (2) elected by district"). Therefore, the plaintiff's argument founders at its premise: there is no right to the direct election of members of a local board of education in Connecticut at all, let alone a right to have a vacancy election conducted at the earliest possible election.

It is also well settled that, when vacant offices are in fact filled by election, the federal constitution permits some delay in the holding of vacancy elections. In *Rodriguez* v. *Popular Democratic Party*, 457 U.S. 1, 102 S. Ct. 2194, 72 L. Ed. 2d 628 (1982), the United States Supreme Court upheld a statute allowing the governor of Puerto Rico to appoint an interim replacement to fill a vacant seat in the Puerto Rico House of Representatives until the next general election. See id., 3, 14. In *Rodriguez*, a member of the Puerto Rico legislature died in January, 1981, less than three months after his election. Id., 3. The plaintiffs in *Rodriguez* claimed that they had a federal constitutional right to a special vacancy election held before the next general election and that the interim appointment process set forth in the commonwealth's statutes violated their right of association under the first amendment. Id., 7. The court held against the plaintiffs. See id., 14.

In arriving at its decision, the court in *Rodriguez* relied on the reasoning of another vacancy election case, *Valenti* v. *Rockefeller*, 292 F. Supp. 851 (S.D.N.Y. 1968), aff'd, 393 U.S. 405, 89 S. Ct. 689, 21 L. Ed. 2d 635 (1969), and aff'd sub nom. *Phillips* v. *Rockefeller*, 393 U.S. 406, 89 S. Ct. 693, 21 L. Ed. 2d 636 (1969), and aff'd sub nom. *Backer* v. *Rockefeller*, 393 U.S. 404, 89 S. Ct. 693, 21 L. Ed. 2d 635 (1969). See *Rodriguez* v. *Popular Democratic Party*, supra, 457 U.S. 10–12. *Valenti* involved a seventeenth amendment challenge to a New York state law requiring a vacant United States Senate position to be filled not at the next election but at the next election *in an even numbered year*. *Valenti* v. *Rockefeller*, supra, 853. In *Valenti*, the court held that New York was not required to hold an election in either 1968 or 1969 for a vacancy that occurred in 1968, and that the state law requiring the vacancy election to wait until 1970 was constitutional. Id., 853–54.

In relying on the reasoning in *Valenti*, the court in *Rodriguez* explained: "[T]he fact that the [s]eventeenth [a]mendment permits a [s]tate, if it chooses, to forgo a special election in favor of a temporary appointment to the United States Senate suggests that a state is not constitutionally prohibited from exercising similar latitude with regard to vacancies in its own legislature. We discern nothing in the [f]ederal [c]onstitution that imposes greater constraints on the [c]ommonwealth of Puerto Rico.

"The [c]ommonwealth's choice to fill legislative vacancies by appointment rather than by a full-scale special election may have some effect on the right of its citizens to elect the members of the Puerto Rico [l]egislature; however, the effect is minimal, and like that in *Valenti*, it does not fall disproportionately on any discrete group of voters, candidates, or political parties. . . . Moreover, the interim appointment system plainly serves the legitimate purpose of ensuring

that vacancies are filled promptly, without the necessity of the expense and inconvenience of a special election. The [c]onstitution does not preclude this practical and widely accepted means of addressing an infrequent problem." (Citation omitted.) *Rodriguez* v. *Popular Democratic Party*, supra, 457 U.S. 11–12.

Here, the plaintiff appears to argue that the first amendment requires the city to hold an election for a vacant board position at the next regularly scheduled city election, in this case the November, 2020 election during which three full-term board positions were also on the ballot. It is true that the charter provision in this case differs from the statute at issue in *Rodriguez* because, in *Rodriguez*, no regularly scheduled election passed before the vacancy was filled. See generally id. Rather, the court in *Rodriguez* held that no *special* election was constitutionally required. Id., 12. In *Valenti*, however, the statute that was upheld required voters to wait through *two* more regularly scheduled elections before casting a vote to fill the vacancy. *Valenti* v. *Rockefeller*, supra, 292 F. Supp. 855. Although it is true that *Valenti* involved the seventeenth amendment, which is not at issue in this case, considered together, *Rodriguez* and *Valenti* (neither of which the plaintiff has considered in her brief) strongly suggest that it does not violate the federal constitution to delay the holding of a vacancy election until the "next biennial election." The plaintiff has presented us with no authority, and this court is aware of none, holding such a provision to be unconstitutional in the thirty-nine years since *Rodriguez*.[14]

B

To the extent the plaintiff claims that the federal constitution entitles her to have the votes counted and the void election validated, we disagree. The plaintiff claims that, even if the charter itself is not constitutionally infirm, the constitution requires that the votes in the election that the city declared void must be counted and the outcome honored because (1) the city having placed the position on the ballot, votes were actually cast for that position, and (2) there was an established past practice of holding vacancy elections in even numbered years.

As discussed in part I of this opinion, the plain language of the charter means that no valid vacancy election for the board position at issue could have been held in November, 2020. "[T]he right or power to hold an election must be based on authority conferred by law, and an election held without affirmative constitutional or statutory authority, or contrary to a material provision of the law, is a nullity, even though it is fairly and honestly conducted." 29 C.J.S. 135–36, Elections § 127 (2005). "A court lacks jurisdiction to authorize or compel the holding of a void election." Id., p. 136.

It is unfortunate that votes were cast for the position that appeared on the ballot in error, but this fact does not mean that an election for the board vacancy position appropriately took place. Similarly, the fact that the votes cast were initially reported in the secretary's election management system does not mean that an election for the position took place.[15] The plaintiff has not presented us with any authority, and we are aware of none, suggesting that constitutional principles require us to validate a void election.

The plaintiff argues that, to avoid unconstitutionally disenfranchising her, the votes cast should be counted and the outcome of the "election" honored. She cites several cases in support of this position: *Roe* v. *Alabama*, 68 F.3d 404 (11th Cir. 1995), *Griffin* v. *Burns*, 570 F.2d 1065 (1st Cir. 1978), *Briscoe* v. *Kusper*, 435 F.2d 1046 (7th Cir. 1970), *Hoblock* v. *Albany County Board of Elections*, 487 F. Supp. 2d 90 (N.D.N.Y. 2006), and *Williams* v. *Sclafani*, 444 F. Supp. 906 (S.D.N.Y.), aff'd sub nom. *Williams* v. *Velez*, 580 F.2d 1046 (2d Cir. 1978). Each of those cases indeed involved rulings by election officials that resulted in the rejection of ballots cast. The difference, however, is that each of those cases involved a valid election or primary election.[16] Here, by contrast, the election itself was void. We agree with the trial court that, when "the charter specifies the method for filling vacancies, that method cannot be changed by a mistake of an election official. If the charter does not authorize an election, then an election cannot be held."

In fact, it would disenfranchise the city's voters, who adopted the charter, to *count* the ballots cast in the void election and disregard the provisions of the charter directing that vacancies must be filled at a biennial election held in odd numbered years. "[T]he electors have not been deprived of their opportunity to participate in the democratic process with respect to the procedure for filling a vacancy because, [a]s the source of a municipality's powers, charters are generally adopted and amended at a referendum by the municipality's electors." (Internal quotation marks omitted.) *Cook-Littman* v. *Board of Selectmen*, supra, 328 Conn. 779. Validating a void election would also disenfranchise the many voters who opted not to cast any vote in the election in reliance on the city's announcement of its correct conclusion that the position had been placed on the ballot in error.[17]

This analysis is consistent with our recent decision in *Cook-Littman*, in which the trial court, construing the charter of the town of Fairfield, ordered the town to conduct a special election to fill a vacant seat on the Board of Selectmen that already had been filled by appointment. Id., 762, 764–65. This court reversed the trial court's judgment, holding that the special election was invalid and that the trial court could not substitute

its own ideas for a clear expression of legislative will. See id., 779. By the time the case had come before this court, the special election the trial court had ordered already had been held, and the winner of that election had replaced the person appointed to fill the vacancy. Id., 765–66. Because the election was never valid, however, this court held that the appointee was entitled to reinstatement. Id., 779. Although no constitutional claims were raised in *Cook-Littman*, that case makes clear that following the express terms of a charter adopted by the voters does not result in disenfranchisement.

The parties' stipulation that a board vacancy election was held in Stamford in 2016 does not change our analysis. The plaintiff contends that this creates an "established past practice" and appears to argue that, if a city violated its charter in the past, it must continue to do so going forward. But a void election is a void election, regardless of whether it is the result of a onetime mistake by an election official or a similar past mistake. The confusion the city's error caused is regrettable. But neither the fact that the city held another vacancy election in 2016 nor the fact that some voters cast absentee ballots in the 2020 election changes the fact that there was no valid election for the board vacancy position, and, thus, no voters were disenfranchised by the city's failure to count and certify the votes cast.

### III

The plaintiff next claims that, even if the charter provision does not violate the federal constitution, it conflicts with the greater protections afforded by the Connecticut constitution. The defendants contend that the charter provision has a legitimate governmental purpose—to have a single process for filling vacancies, regardless of the office—and that there is no state constitutional principle that provides that vacancies must be filled by election as soon as possible. We conclude that the plaintiff has not demonstrated that the Connecticut constitution affords greater protections under the facts of this case.

As in part II of this opinion, our review of whether a charter provision violates the state constitution is plenary. See, e.g., *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, supra, 317 Conn. 405. In *State* v. *Geisler*, 222 Conn. 672, 684–85, 610 A.2d 1225 (1992), "we identified six nonexclusive tools of analysis to be considered, to the extent applicable, whenever we are called on as a matter of first impression to define the scope and parameters of the state constitution: (1) persuasive relevant federal precedents; (2) historical insights into the intent of our constitutional forebears; (3) the operative constitutional text; (4) related Connecticut precedents; (5) persuasive precedents of other states; and (6) . . . relevant public policies." (Internal quotation marks omitted.) *State* v. *McCleese*, 333 Conn. 378,

387, 215 A.3d 1154 (2019). "It is not critical to a proper *Geisler* analysis that we discuss the various factors in any particular order or even that we address each factor." Id., 388.

As for the *Geisler* factors concerning constitutional text, federal and Connecticut precedents and public policy, the plaintiff has primarily recited unhelpful truisms—that the state constitution in some contexts provides Connecticut citizens greater protection than the federal constitution. The plaintiff does not engage in any real analysis suggesting that the constitutional text, Connecticut precedent, or federal precedent supports an enhanced state constitutional right. As discussed in part II of this opinion, we conclude that federal precedent does not support the plaintiff's claim. The plaintiff does not address our state constitutional history at all, except to say that "the intent of our constitutional forebears to protect these fundamental, foundational rights is made clear by the sheer number of overlapping applicable rights set forth in the Connecticut constitution."

With respect to authority from other jurisdictions, the plaintiff cites numerous out-of-state cases in support of her argument that the state constitution requires vacancy positions to be filled by election—as opposed to by appointment—as soon as possible. We do not find any of these cases to be persuasive. Most come from states with constitutional provisions that expressly address vacancy elections and require that vacancies be filled in a particular way or within a particular time frame. See *Bolin* v. *Superior Court*, 85 Ariz. 131, 137–38, 333 P.2d 295 (1958); *State* v. *Highfield*, 34 Del. 272, 283–84, 152 A. 45 (1930); *Roher* v. *Dinkins*, 32 N.Y.2d 180, 184–86, 298 N.E.2d 37, 344 N.Y.S.2d 841 (1973); *Rodwell* v. *Rowland*, 137 N.C. 617, 618, 50 S.E. 319 (1905); *State ex rel. Whitney* v. *Johns*, 3 Or. 533, 534–35 (1869); *Commonwealth* v. *Maxwell*, 27 Pa. 444, 449 (1856).[18] Our constitution contains no such provision pertaining to the vacancy at issue in this case. And in *State ex rel. Harsha* v. *Troxel*, 125 Ohio St. 235, 237–38, 181 N.E. 16 (1932), another case on which the plaintiff relies, the applicable statute contained *no* mechanism for filling a vacancy by appointment, which meant that the position would remain completely unfilled in the absence of a vacancy election.

The plaintiff advances no authority, and we are aware of none, indicating that any of the *Geisler* factors support her claim that the state constitution provides greater protection than the federal constitution under the facts of this case.

IV

Finally, the plaintiff claims that the doctrine of municipal estoppel requires the defendants to count the votes cast because the vacant position appeared on the ballot for the November, 2020 election. Specifically, she

argues that she detrimentally relied on the position's appearance on the ballot by filing the proper forms to register as a write-in candidate and undertaking the effort to run a race for the vacant position. We disagree that municipal estoppel can be used to validate a void election.

"[F]or a court to invoke municipal estoppel, the aggrieved party must establish that: (1) an authorized agent of the municipality had done or said something calculated or intended to induce the party to believe that certain facts existed and to act on that belief; (2) the party had exercised due diligence to ascertain the truth and not only lacked knowledge of the true state of things, but also had no convenient means of acquiring that knowledge; (3) the party had changed its position in reliance on those facts; and (4) the party would be subjected to a substantial loss if the municipality were permitted to negate the acts of its agents." (Internal quotation marks omitted.) *Levine* v. *Sterling*, 300 Conn. 521, 535, 16 A.3d 664 (2011). The party claiming estoppel has the burden of proof. Id. "Whether that burden has been met is a question of fact that will not be overturned unless it is clearly erroneous." (Internal quotation marks omitted.) Id.

The trial court did not address the plaintiff's municipal estoppel claim in its memorandum of decision, although both parties briefed the issue before the trial court. Because the issue of whether the plaintiff has met her burden is a question of fact and the trial court did not make such a finding, under ordinary circumstances, we might consider whether a remand to or an articulation by the trial court would be required. See Practice Book § 61-10 (b); *Russo* v. *Waterbury*, supra, 304 Conn. 737. However, "[t]here are times . . . when the undisputed facts or uncontroverted evidence and testimony in the record make a factual conclusion inevitable so that a remand to the trial court for a determination would be unnecessary." (Internal quotation marks omitted.) *Russo* v. *Waterbury*, supra, 737. In the present case, a remand would be pointless because the trial court could reach only one conclusion—that the estoppel claim fails. First, as previously discussed, under the present circumstances, there was no valid election. The plaintiff cannot show that she would be subjected to a substantial loss in this case because, under the charter, there was no election in which she could run. Therefore, there was no seat to lose. In addition, the plaintiff cannot show that she "lacked knowledge of the true state of things" or had "no convenient means of acquiring that knowledge . . . ." (Internal quotation marks omitted.) *Levine* v. *Sterling*, supra, 300 Conn. 535. Although it is true that eleven days passed between the time when the plaintiff registered as a write-in candidate and when she met with city officials to discuss the error, had the plaintiff exercised due diligence by reading the charter or asking the city for clarification before

registering as a write-in candidate, she could have avoided any harm resulting from her misapprehension of the charter. The intervenor in this case, who appears to have been the first to discover and report on the ballot error in an October 9, 2020 blog post, did exactly that. Finally, the plaintiff also had actual knowledge of the true state of affairs no later than October 16, 2020, when Mayor Martin and Attorney Emmett met with the plaintiff after discovering that the position had been placed on the ballot in error. Because the plaintiff has failed to sustain her burden of establishing a necessary element of municipal estoppel, we reject this claim.

The judgment is affirmed.

In this opinion the other justices concurred.

* July 26, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The defendants are Lucy F. Corelli, in her official capacity as Republican registrar of voters; Ronald Malloy, in his official capacity as Democratic registrar of voters; Lyda Ruijter, in her official capacity as city and town clerk; Jack Scherban, in his official capacity as head moderator; and Denise Merrill, secretary of the state. The defendant Rebecca Hamman, in her official capacity as a member of the board, filed a separate brief. Intervenor Joshua A. Esses, who registered as a write-in candidate, also filed a separate brief. We refer in this opinion to Corelli, Malloy, Ruijter, Scherban and Merrill as the defendants, and to Hamman individually by name.

[2] The plaintiff also claims that the defendant Rebecca Hamman, a member of the board, and the intervenor, Joshua A. Esses, both write-in candidates for the vacant position that was placed on the ballot, are barred from seeking to void an election in which they participated. Because other claims by the plaintiff are dispositive, we do not reach this issue.

[3] The four candidates for the three full-term board seats on the ballot received between 22,190 and 35,252 votes each.

[4] General Statutes § 9-220 provides: "If any town office in any town is vacant from any cause, such town, if such office is elective, shall, except as otherwise provided by law, fill the vacancy at the next town election or at a special election called for such purpose in accordance with the provisions of section 9-164, but, until such vacancy is so filled, it shall be filled by the selectmen. The selectmen shall fill all vacancies in offices to which they have the power of appointment."

[5] Section C1-80-1 of the Stamford Charter provides that members of the board are elective officers.

[6] Section C1-40-2 of the Stamford Charter provides in relevant part: "Nothing contained in this Act shall be construed to repeal or terminate any statute of the State or ordinance of the City or any rule or regulation of any City Board, Commission, Department, Agency, or Authority. They shall remain in full force and effect, within the territorial limits of the City when not inconsistent with the provisions of this Charter, to be construed and operated in harmony with its provisions, until amended or repealed as herein provided. . . ."

[7] See footnote 4 of this opinion.

[8] Section C1-70-3 of the Stamford Charter provides: "The terms of office of elective officers hereunder shall commence on the first day of December succeeding the election. The term of office of the Town and City Clerk shall be four (4) years; the City Constables shall be two (2) years and, commencing with the biennial election of 2013, the term of office for City Constables shall be four (4) years; the terms of office of the members of the Board of Representatives and the Mayor shall be four (4) years commencing, in accordance with Section C1-40-3 hereof, with the biennial election of 1997. The term of office of each member of the Board of Finance and of the Registrars of Voters shall be four (4) years. The term of office of each member of the Board of Education shall be three (3) years."

[9] Section C1-80-5 (a) of the Stamford Charter provides in relevant part: "Except as otherwise provided in [Section] C1-80-2 as to the filling of a vacancy, at each annual election, any political party may nominate not more than three candidates for membership on the Board of Education, to hold office for a three-year term, commencing on December first following the

election. . . .”

[10] To the extent the plaintiff raises fourteenth amendment due process or equal protection claims, they are inadequately briefed and we therefore do not consider them. See *State* v. *Buhl,* 321 Conn. 688, 728–29, 138 A.3d 868 (2016).

[11] When pressed at oral argument before this court, the plaintiff's appellate counsel stated that the specific constitutional violation was “depriving citizens of a right to representation.” We do not find this to be a clearly articulated constitutional claim.

[12] In *Sailors,* the court held that the board of education was a nonlegislative body and that there was no constitutional reason why board members could not be appointed rather than elected. *Sailors* v. *Board of Education,* supra, 387 U.S. 108. Although the court did not expressly consider whether the rule would also apply to legislative bodies; id., 109–10; the plaintiff does not argue that Connecticut boards of education are legislative bodies, and our case law strongly suggests that they are not. See *Stratford* v. *State Board of Mediation & Arbitration,* 239 Conn. 32, 49, 681 A.2d 281 (1996) (local board of education was not “legislative body of the municipal employer” because, “[a]lthough a local board of education has an important role in setting educational policy, its responsibilities do not customarily encompass the enactment of ordinances” (internal quotation marks omitted)).

[13] Local boards of education are creatures of the state, authorized by statute. See General Statutes § 10-218 et seq.; see also General Statutes §§ 9-203 through 9-206a. However, “the powers of local boards of education are not defined only by state statute, and . . . a local charter may limit the powers of the local board of education [when] its provisions are ‘not inconsistent with or inimical to the efficient and proper operation of the educational system otherwise entrusted by state law to the local boards.’ ” *Cheshire* v. *McKenney,* 182 Conn. 253, 259, 438 A.2d 88 (1980).

[14] Because we conclude that the plaintiff has not advanced a serious challenge to the constitutionality of the charter provision by providing authority in support of her claim that the constitution demands that the city fill the vacancy at the next election, we also decline to analyze the provision under either the strict scrutiny standard of review or the *Anderson-Burdick* balancing test, which demands an analysis of competing interests that the plaintiff fails to provide. See *Burdick* v. *Takushi,* 504 U.S. 428, 434, 112 S. Ct. 2059, 119 L. Ed. 2d 245 (1992); *Anderson* v. *Celebrezze,* 460 U.S. 780, 789, 103 S. Ct. 1564, 75 L. Ed. 2d 547 (1983); see *Burdick* v. *Takushi,* supra, 434 (“[a] court considering a challenge to a state election law must weigh ‘the character and magnitude of the asserted injury to the rights protected by the [f]irst and [f]ourteenth [a]mendments that the plaintiff seeks to vindicate’ against ‘the precise interests put forward by the [s]tate as justifications for the burden imposed by its rule,’ taking into consideration ‘the extent to which those interests make it necessary to burden the plaintiff's rights’ ”).

[15] Although we ultimately agree with the defendants in the present case that an election should not have been held and that the race should not have appeared on any ballots, until the trial court and, ultimately, this court ruled on the matter, this outcome was not clear. When the validity of an election is unclear, the wisest course would be for the head moderator to include the disputed votes for the vacant position in his final report to the secretary of the state. Although reporting votes cast in a void election might not be required by statute, at the time the votes were reported, there was no legally conclusive decision that the election was void. That determination is made today, when this opinion is officially released. As a result, the votes should be recorded for historical purposes and to assist courts in the event of a challenge to the validity of the election or any ruling of an election official.

[16] For example, in *Hoblock,* the issue was the rejection of absentee ballots that were cast but subsequently rejected in a valid election. *Hoblock* v. *Albany County Board of Elections,* supra, 487 F. Supp. 2d 97–98. The absentee ballots issued to voters were invalid; id., 95; but the underlying election was valid. Id., 98. In *Griffin,* the issue was the rejection of all absentee ballots cast in a valid primary election. *Griffin* v. *Burns,* supra, 570 F.2d 1074. *Roe* v. *Alabama,* supra, 68 F.3d 405, also involved contested absentee ballots in an otherwise valid election. In *Briscoe,* the issue was the invalidation of nominating petitions, signed in a previously acceptable way, after election officials had adopted new regulations without prior publication or an opportunity for candidates to respond when an election official invalidated any signature. *Briscoe* v. *Kusper,* supra, 435 F.2d 1054–55. Similarly, *Williams*

v. *Sclafani*, supra, 444 F. Supp. 909, involved the validation of designating petitions required for placement on a primary ballot.

[17] The candidates for the full-term board positions properly on the ballot received more than 22,000 votes each. The plaintiff, who received the highest number of votes for the vacant position that appeared on the ballot, received 578 votes.

[18] In *State ex rel. Toledo* v. *Lucas County Board of Elections*, 95 Ohio St. 3d 73, 76–78, 765 N.E.2d 854 (2002), the court followed the applicable provisions of the city charter of Toledo, Ohio, holding that those provisions were not in conflict with the Ohio constitution.